310 Ga. 345
FINAL COPY

S20A0820.  THE STATE v. COPELAND.
S20A0821.  THE STATE v. SCOTT.
S20A0822.  THE STATE v. HOWELL.

BETHEL, Justice.

A Washington County grand jury indicted former sheriff's deputies Henry Lee Copeland, Rhett Scott, and Michael Howell for felony murder and other offenses in connection with the death of Eurie Lee Martin. Each defendant sought immunity from prosecution under OCGA § 16-3-24.2, claiming that his actions resulting in Martin's death were in defense of himself or others. Following a hearing, the trial court issued an order granting immunity to Deputies Copeland, Scott, and Howell, and the State appealed. We determine that, in granting immunity, the trial court made findings of material fact that were inconsistent with its legal conclusions regarding the deputies' encounter with Martin, conflated principles regarding the reasonable use of force by law enforcement with self-defense and immunity, made unclear findings

of material fact with respect to whether any or all of the deputies used force intended or likely to cause death, and did not address the facts pertinent to each of the three deputies individually. For these reasons, we vacate the trial court's ruling and remand the cases for further consideration consistent with this opinion.

1. "On appeal [from an order on a motion under OCGA § 16-3-24.2], we review the evidence in the light most favorable to the trial court's ruling, and we [generally] accept the trial court's findings with regard to questions of fact and credibility if there is any evidence to support them." (Citation and punctuation omitted.) *State v. Green*, 288 Ga. 1, 2 (2) (701 SE2d 151) (2010). However, the Court "owes no deference to a trial court's factual findings gleaned from a review of a videotape that are not the subject of testimony requiring the trial court's weighing of credibility or resolving of conflicts in the evidence." *Clay v. State*, 290 Ga. 822, 825 (1) (A) (2) n.1 (725 SE2d 260) (2012). This Court conducts a de novo review of a trial court's legal application of OCGA § 16-3-24.2. See *Green*, 288 Ga. at 2 (2).

In its order granting immunity, the trial court made factual

findings based upon the evidence presented at the immunity hearing, which included the testimony of the deputies and other witnesses. In addition, a number of other facts are plainly established by video and audio recordings admitted into evidence at the hearing, which were made before and during the deputies' encounter with Martin. The trial court's findings are set forth below, as well as facts clearly evident from video and audio recordings, where indicated.

On July 7, 2017, Martin was walking along Deepstep Road in Washington County on a very hot afternoon. Along the way, he walked up the driveway of a home on that two-lane road and requested a drink of water from the homeowner by motioning with a cut-off Coke can that he was carrying. The homeowner, who was concerned by Martin's unkempt appearance, refused Martin's request. Martin continued on his way, but the homeowner called 911 to report Martin, describing him on the 911 recording as a "black man, probably 50-plus-years-old, about 6′3″, 220 pounds," and

3

saying that he did not know if Martin was "crazy, drunk, or what."[1]

The homeowner did not indicate that Martin approached merely to request water.

Deputy Howell responded to the "suspicious person" call first, observed Martin walking "in the roadway," and attempted to speak with Martin from his patrol car, asking Martin his name and whether Martin was okay. Martin responded by asking, "Who are you?" and then kept walking. Deputy Howell then radioed for backup, activated his vehicle's blue lights, and slowly followed behind Martin. After activating the blue lights, Deputy Howell's dashboard camera recording system, which recorded video and audio, was also activated. The video recording taken from that camera shows Martin walking on the left side of the road, which had no sidewalk, on or near the fog-line.

Deputy Copeland responded to Deputy Howell's call for backup and arrived about two-and-a-half minutes later. Deputy Copeland

---

[1] It was later learned that Martin had a long history of mental illness and treatment, but the deputies did not know this during their encounter with Martin.

4

approached from the other direction on Deepstep Road with his vehicle's blue lights activated and his dashboard camera recording and pulled his vehicle to the side of the road on which Martin was walking, blocking Martin's path. Martin then began to walk across the road. Dashboard camera recordings show that Deputy Copeland exited his vehicle, instructed Martin to "come here," and then repeatedly told Martin to "get out of the road." Martin can be heard on Deputy Copeland's dashboard camera recording saying, "Leave me alone," "I ain't messin' with you, man" and "I ain't did nothing." At this point, Martin and Deputy Copeland walked down the road and out of frame of both dashboard camera recordings. A few moments later, Deputy Howell is shown approaching Deputy Copeland.

The trial court found, relying on Deputy Howell's and Deputy Copeland's testimony, that during the period in which all three men are out of frame, Martin "thr[ew] down [a] Coke can," took "a defensive stance"  and "cl[e]nche[d] his fists," causing Deputies

5

Howell and Copeland to believe that Martin was "about to fight."[2] The trial court further found that Deputy Copeland "then repeatedly command[ed] Mr. Martin to stop and put his hands behind his back." Deputy Howell then asked Deputy Copeland if he had his TASER,[3] and told Deputy Copeland to "tase his a\*\*."[4] Deputy Copeland told Martin to stop, put his hands behind his back, and get on the ground, and then warned Martin that the deputy would "tase" him if he refused. Martin did not comply with the deputies' instructions, and Deputy Copeland shot Martin with his TASER.[5] Martin fell to the

---

[2] When the trial court discussed this part of the encounter in its conclusions of law, the court relied on Deputy Copeland's testimony to note that Martin exhibited a "threatening demeanor" that included turning toward Deputy Copeland with "clenched fists" and "'bowing up' in a combative posture."

[3] "TASER is the tradename for electroshock guns, which are used widely by law enforcement agencies world-wide. The name 'TASER' is an acronym for 'Thomas A. Swift's Electric Rifle,' designed in 1969 by inventor Jack Cover." (Citation and punctuation omitted.) *Eberhart v. State*, 307 Ga. 254, 256 (1) n.2 (835 SE2d 192) (2019).

[4] We note, however, that a review of the dashboard camera recordings does not support a finding that either deputy commanded Martin to stop or put his hands behind his back before the order to "tase his a\*\*" was given by Deputy Howell, which came less than 30 seconds after the deputies exited their vehicles.

[5] The trial court found, based on GBI agent testimony and the TASER download summary, that Deputy Copeland's TASER was activated four times with a total of 28 seconds of electrical discharge in this part of the encounter,

6

ground and then removed a TASER probe from his arm, stood back up, and continued walking away from the deputies. Deputy Howell radioed Deputy Scott for backup and told him that they had shot Martin with the TASER but that he was "still fighting."

On a bystander's video recording, Martin can be seen walking away from the deputies and up a small hill and into the yard of a residence, followed closely by Deputies Howell and Copeland. The trial court found that as the deputies were following Martin, they continued to instruct him to stop and get on the ground or he would be "tased." Martin ignored the deputies' instructions, walked faster, and then swung at Deputy Copeland when Deputy Copeland moved close to him.[6]

Deputy Scott arrived soon thereafter, and Deputy Howell told

---

although it is unclear how long Martin actually received an electrical discharge.

[6] Due to the perspective of the bystander's video, it is not clear if Martin swung at Deputy Copeland. The trial court noted in its order that while there was "no 'clear' view of the strike," the court reached its conclusion "based upon the movement shown in the [bystander's] video, the deputies' testimony, and the videographer's contemporaneous comments" that "Oh, I [inaudible] that n****r don't swing on that cracker. They gonna bust his a**." This evidence supports the trial court's finding.

Deputy Scott that Martin was "tased" once and it "didn't phase [sic] him." All three deputies encircled Martin, who was, at that point, standing with his arms by his side. Martin did not comply with the deputies' continued instructions to get on the ground, and Deputy Scott, who was positioned more or less behind Martin, then lifted Martin's shirt and deployed his TASER from a close distance to Martin's back.[7] According to the trial court, Martin spun "toward Deputy Scott with his arms flailing in an attempt to dislodge the [TASER] probes and possibly to hit Deputy Scott." Martin then fell to the ground. The deputies converged on him, repeatedly commanding him to roll over and show his hands.

The deputies secured a handcuff to Martin's right hand, but his left hand remained tucked under his body as he and the deputies "struggle[d]." Deputies Howell and Copeland[8] shocked Martin with

---

[7] The trial court found, relying on the TASER download summary, that Deputy Scott's TASER was activated a total of eight times for a combined duration of 61 seconds, though it is unclear how long Martin actually received an electrical discharge.

[8] The trial court found, relying on the TASER download summary, that Deputy Copeland's TASER was activated three times with a total electrical

"drive stuns" using TASERs[9] and attempted to pry his left arm from under his body to finish handcuffing him, telling him that if he would roll over it would stop. The deputies testified that once Martin's right hand was cuffed, it was imperative to cuff his other hand because a loose handcuffed hand is a potentially lethal threat. After Martin was handcuffed, the tasing ceased. He remained on the ground, and a first responder who arrived at the scene found that Martin did not have a pulse and began performing CPR on him. Martin, however, did not resuscitate and died at the scene.

Deputies Copeland, Howell, and Scott were indicted on two counts each of felony murder and involuntary manslaughter and one count each of false imprisonment, aggravated assault, simple assault, and reckless conduct. They filed motions for immunity under OCGA § 16-3-24.2, which the trial court granted following the hearing and briefing.

---

charge duration of 25 seconds, though it is unclear how long Martin actually received an electrical discharge.

[9] Deputy Howell testified that, during this time, he used Deputy Scott's TASER, which had been dropped at an earlier point in the encounter with Martin.

2. The State appeals the grant of those motions, arguing that the trial court, in relying upon *State v. Hall*, 339 Ga. App. 237 (793 SE2d 522) (2016), impermissibly expanded the scope of OCGA § 16-3-24.2 beyond the plain meaning of the statute. More specifically, the State argues that the trial court failed to make a finding that the deputies acted in self-defense and that, instead, the trial court conflated the law of self-defense pertinent to OCGA § 16-3-24.2 with the law pertaining to justification set forth in OCGA § 16-3-20 (2) and (4), which is not relevant to the trial court's analysis of the motions under OCGA § 16-3-24.2.

We hold that the trial court made factual findings that were inconsistent with its legal conclusions in support of its grants of immunity in favor of Deputies Copeland, Scott, and Howell under OCGA § 16-3-24.2, conflated legal concepts that are relevant to the immunity motion with concepts that are not relevant, made unclear findings of material fact with respect to whether any or all of the deputies used force intended or likely to cause death, and did not make individualized determinations as to whether each deputy was

10

entitled to immunity based on the facts pertinent to each. We therefore vacate the trial court's order granting immunity in all three cases and remand these cases so that the trial court can reconsider the motions for immunity consistent with this opinion.

(a) *The immunity statute.*

OCGA § 16-3-24.2 provides that a person is immune from prosecution where he can demonstrate by a preponderance of the evidence that he threatened or used force based on a reasonable belief that such threat or force was necessary to defend himself or a third person against another's imminent use of unlawful force. See OCGA §§ 16-3-24.2;[10] 16-3-21. See also *Mullins v. State*, 287 Ga. 302, 302 (1) (695 SE2d 621) (2010); *Bunn v. State*, 284 Ga. 410, 413 (3) (667 SE2d 605) (2008). When the person claiming immunity uses force intended or likely to cause death or great bodily harm, that

[10] OCGA § 16-3-24.2 also provides that a person who uses threats or force in defense of habitation under OCGA § 16-3-23, in defense of property other than habitation under OCGA § 16-3-24, or under OCGA § 16-3-23.1 (no duty to retreat) is immune from prosecution. However, Deputies Copeland, Scott, and Howell did not raise any claim of immunity under these other provisions, and we do not consider them here.

person must also prove by a preponderance of the evidence that such potentially lethal force was based on a reasonable belief that the force was necessary to prevent death or great bodily injury at the hands of the alleged victim or to prevent the commission of a forcible felony. See OCGA § 16-3-21 (a).[11] A person is not justified in using force in self-defense if he was the aggressor. See OCGA § 16-3-21 (b)(3).[12] Law enforcement officers may seek immunity from prosecution

---

[11] OCGA § 16-3-21 (a) provides in full:

A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself or a third person against such other's imminent use of unlawful force; however, except as provided in Code Section 16-3-23 [defense of habitation], a person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony.

[12] OCGA § 16-3-21 (b) provides in full:

A person is not justified in using force under the circumstances specified in subsection (a) of this Code section if he:

(1) Initially provokes the use of force against himself with the intent to use such force as an excuse to inflict bodily harm upon the assailant;

(2) Is attempting to commit, committing, or fleeing after the commission or attempted commission of a felony; or

(3) Was the aggressor or was engaged in a combat by agreement unless he withdraws from the encounter and effectively communicates to such other person his intent to do so and the

under OCGA § 16-3-24.2 when they are indicted based on their threats or use of force. See *State v. Thompson*, 288 Ga. 165, 169 (702 SE2d 198) (2010); *Bunn*, 284 Ga. at 413 (3). When they do, their evidentiary burden is identical to that of any other defendant. See *Thompson*, 288 Ga. at 169.

(b) *Tiers of police-citizen encounters.*

Because Deputies Copeland, Scott, and Howell encountered Martin in their capacity as law enforcement officers, it was also relevant for the trial court to consider the legal classification of their encounter with Martin. As we have explained,

> [t]here are at least three types of police-citizen encounters: verbal communications that involve no coercion or detention; brief stops or seizures that must be accompanied by a reasonable suspicion; and arrests, which can be supported only by probable cause.

(Citation and punctuation omitted.) *Jones v. State*, 291 Ga. 35, 37 (1) (727 SE2d 456) (2012).

> In a "first-tier" encounter, officers

may approach citizens, ask for identification, and freely

other, notwithstanding, continues and threatens to continue the use of unlawful force.

> question the citizen without any basis or belief that the citizen is involved in criminal activity, as long as the officers do not detain the citizen or create the impression that the citizen may not leave[.] So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required.

(Citation and punctuation omitted.) *In the Interest of D. H.*, 285 Ga. 51, 53 (2) (673 SE2d 191) (2009). Importantly, an officer may not use force to effectuate a first-tier encounter as an officer in such an encounter has no authority to detain or restrict the liberty of a citizen, and the citizen has the right to withdraw from the encounter or resist any such use of force with a proportionate use of force. See *Ewumi v. State*, 315 Ga. App. 656, 663-664 (1) (b) (727 SE2d 257) (2012) ("[B]ecause [the] arrest was unlawful, [the suspect] was justified in resisting the attempted arrest with all force that was reasonably necessary to do so."); *Black v. State*, 281 Ga. App. 40, 44 (1) (635 SE2d 568) (2006) (a citizen has the right to ignore police and avoid them even by running away in a first-tier encounter); *Brooks v. State*, 206 Ga. App. 485, 488 (2) (425 SE2d 911) (1992) (if police lack probable cause or articulable suspicion to authorize a seizure of

14

an individual, the individual is entitled to resist the unlawful seizure). See also *Glenn v. State*, ___ Ga. ___ (1) (___ SE2d ___) (2020) (discussing at length the right to resist an unlawful arrest under Georgia law).

In a "second-tier" encounter, when an officer develops a reasonable, articulable suspicion that the citizen is committing or has committed a crime, the officer then has the authority to detain the citizen for an investigative stop, or what has come to be known as a "*Terry* stop."[13] See *State v. Walker*, 295 Ga. 888, 889 (764 SE2d 804) (2014). In a second-tier encounter, the suspect's physical resistance to his detention is unlawful. See, e.g., *Miller v. State*, 351 Ga. App. 757, 765 (833 SE2d 142) (2019) (individual's ability to withdraw from a consensual first-tier encounter does not apply to a second-tier encounter); *Sims v. State*, 335 Ga. App. 625, 629 (782 SE2d 687) (2016) (individual may not resist and walk away from a *Terry* stop). In a second-tier encounter, the officer may also take

---

[13] See *Terry v. Ohio*, 392 U. S. 1, 21 (III) (88 SCt 1868, 20 LE2d 889) (1968).

reasonable steps to protect his safety and the safety of others while detaining the individual. See, e.g., *Gray v. State*, 296 Ga. App. 878, 879-880 (1) (676 SE2d 36) (2009) (relying on *Holsey v. State*, 271 Ga. 856, 861 (6) (524 SE2d 473) (1999)).

In a "third-tier" encounter, when an officer has probable cause to believe that an individual is committing or has committed a crime, the officer is authorized to make an arrest and take the individual into custody. See *Jones*, 291 Ga. at 37 (1). When an officer with probable cause seeks to arrest an individual, that person is not free to flee or resist the arrest, although he retains the right not to speak with the officer. See U. S. Const. Amend. V; *Miranda v. Arizona*, 384 U. S. 436, 467-472 (86 SCt 1602, 16 LE2d 694) (1966); Ga. Const. of 1983, Art. I, Sec. I, Par. XVI; *Fairwell v. State*, 311 Ga. App. 834, 835-836 (1) (a) (717 SE2d 332) (2011) (unlawful for suspect to flee pursuing police officer in an attempt to escape arrest); *Smith v. State*, 84 Ga. App. 79, 81 (1) (65 SE2d 709) (1951) ("If the attempted arrest was legal [the suspect] had no right whatever to resist it; if it was illegal, he had the right to resist with all force necessary for that

16

purpose."). However, a police officer "is authorized to use only that degree of force that is reasonably necessary to accomplish the detention or arrest, and may not use excessive force." *Ramirez v. State*, 279 Ga. 569, 577 (10) (619 SE2d 668) (2005).

(c) *Analysis of the trial court's findings and conclusions.*

In its order granting immunity, the trial court concluded that Deputies Howell and Copeland were engaged in a first-tier encounter from the time they first encountered Martin on the roadside until he demonstrated what the trial court found to be a "threatening demeanor" by turning toward Deputy Copeland and "'bowing up' in a combative posture." This finding, located in the trial court's conclusions of law, was apparently based on the trial court's factual findings that Martin "thr[ew] down a Coke can," took "a defensive stance," and "cl[e]nche[d] his fists" after Deputy Copeland followed Martin as he walked away out of view of the dashboard cameras. The trial court concluded that Martin's conduct at *that* point "provided an articulable suspicion" for Deputies Copeland and Howell to investigate "the possible offenses of

17

loitering . . . and walking upon highway,"[14] and at that point, the encounter became a second-tier encounter.

(i) Contrary to the trial court's conclusion, however, the court's express findings of fact and the recordings of the incident show that there was no legal basis to detain Martin for loitering at that time. OCGA § 16-11-36 (a) provides that "[a] person commits the [misdemeanor] offense of loitering . . . when he is in a place at a time or in a manner not usual for law-abiding individuals under circumstances that warrant a justifiable and reasonable alarm or immediate concern for the safety of persons or property in the vicinity." There was simply no evidence that Martin, who was

---

[14] The deputies argue on appeal that when Martin "thr[ew] down" the can he was carrying, they had reasonable suspicion to investigate him for littering in violation of OCGA § 16-7-43 (a), which provides that it is a misdemeanor "for any person . . . to dump, deposit, throw, or leave . . . litter on any public or private property in this state[.]" Deputy Howell alone also argues that he was justified in stopping Martin to investigate him for criminal trespass in violation of OCGA § 16-7-21 (b) (1), which provides that a person commits the offense of criminal trespass when he "knowingly and without authority . . . [e]nters upon the land . . . of another person . . . for an unlawful purpose." However, the trial court did not base its ruling on a finding that there was a reasonable articulable suspicion or probable cause to believe that either of these alleged crimes had been committed or were in the process of being committed by Martin. We decline to undertake that analysis in the first instance.

18

walking along a public road on a summer afternoon, was "in a place at a time or in a manner not usual for law-abiding individuals." See, e.g., *Womack v. State*, 355 Ga. App. 804, 808 (2) (a) (845 SE2d 747) (2020) (individual's conduct in walking out of a store did not provide sufficient facts to support reasonable suspicion of loitering). Thus, Deputies Copeland and Howell could not form a reasonable articulable suspicion that Martin was loitering and thus had no authority to escalate the encounter into a second-tier encounter on that basis.

(ii) The question is closer with regard to the deputies' contention that they had at least reasonable suspicion sufficient to detain Martin for the crime of walking upon the highway. OCGA § 40-6-96 (c) provides that "[w]here a sidewalk is not provided but a shoulder is available, any pedestrian standing or striding along and upon a highway shall stand or stride only on the shoulder, as far as practicable from the edge of the roadway." A violation of OCGA § 40-6-96 (c) is a misdemeanor. See OCGA § 40-6-1 (a).

Under *Terry*, if either Deputy Howell or Deputy Copeland had

reasonable suspicion to investigate Martin for the offense of walking upon the highway, then this suspected crime would have formed the basis for a second-tier encounter. As noted above, in a second-tier encounter, officers are authorized to briefly detain the suspect, and the suspect's physical resistance to that detention is unlawful. See, e.g., *Sims*, 335 Ga. App. at 629.

In this case, the video recording from Deputy Howell's dashboard camera shows Martin walking on or near the fog-line of Deepstep Road, which has no sidewalk, and the only evidence that Martin was walking *in* the roadway was Deputy Howell's testimony about his initial sighting of Martin, which occurred before the video begins. If Deputy Howell formed a reasonable suspicion that Martin was committing this offense at all, such suspicion must have formed based on his earliest observations of Martin before he activated his dashboard camera and exited his vehicle to confront Martin, and before Deputy Copeland arrived at the scene. None of the evidence from that point forward in the encounter supports a conclusion that Martin was committing the offense of walking upon the highway. In

20

particular, contrary to the trial court's conclusion, such suspicion could not have been formed with respect to that offense when Martin later assumed a "defensive stance" and his demeanor became "threatening." Defensive or threatening behavior on the part of Martin at the point he was confronted by the deputies has nothing to do with whether he previously committed the offense of walking in the roadway.

However, the trial court clearly concluded that the deputies' initial encounter with Martin was a first-tier encounter. If Martin assumed a "defensive stance" while the deputies were engaged only in a first-tier encounter, such behavior would be consistent with his right to decline any contact from the police at that point in the encounter. Such behavior by a citizen during a first-tier encounter, when there is no evidence that the citizen has committed or is committing a crime, does not provide a law enforcement officer with a reasonable articulable suspicion necessary to escalate the encounter to a *Terry* stop. Cf. *Black*, 281 Ga. App. at 44 (1) ("[A] citizen's ability to walk away or otherwise avoid a police officer is

21

the touchstone of a first-tier encounter. Even running from police during a first-tier encounter is wholly permissible." (Citation and punctuation omitted.)).

Here, the trial court found that Deputy Howell observed Martin walking "in the roadway" when the deputy arrived at the scene, yet it concluded that the initial encounter between Deputy Howell (and Deputy Copeland) and Martin was only a first-tier encounter. But a finding that Martin was engaged in behavior that constituted a criminal offense would have, at the moment such behavior was first observed, given the deputies the suspicion necessary to commence a second-tier *Terry* stop of Martin, which Martin would not have been free to resist or evade. Moreover, puzzlingly, the trial court concluded that the deputies formed the reasonable suspicion necessary to effectuate a *Terry* stop only after Martin took a "defensive stance" and exhibited a "threatening demeanor" toward the deputies, actions that have nothing to do with whether he committed the offense of walking upon the highway. The trial court's legal conclusions were thus inconsistent with its factual

findings in regard to the circumstances surrounding the deputies' initial contact with Martin.

On remand, the trial court must resolve these inconsistencies and determine whether Deputy Howell's initial observation of Martin or some action on Martin's part aside from his "defensive stance" or "threatening demeanor" gave the deputies reasonable articulable suspicion that the crime of walking on the highway had occurred or was occurring. If so, at that time the encounter authorized a *Terry* stop, and the deputies had authority to detain Martin. See *Walker*, 295 Ga. at 889. However, if not, Martin had the legal right to resist any deprivation of his liberty by the deputies. See *Black*, 281 Ga. App. at 44 (1). In that situation, Martin's resistance to the deputies' attempts to stop him would not be "unlawful" under OCGA § 16-3-21 (a). Because the trial court did not properly consider these issues in its order granting immunity to Deputies Copeland, Scott, and Howell, its order must be vacated.

(iii)   In addition, even if Martin's conduct constituted an "imminent use of *unlawful* force" under the framework set forth

23

above, that is not the end of the inquiry before the trial court. The court must further consider whether the deputies acted in full accord with OCGA § 16-3-21 such that they should be granted immunity from prosecution. To qualify for immunity, the deputies were required by OCGA § 16-3-24.2 to show that they "use[d] threats or force in accordance with Code Section 16-3-21, 16-3-23, 16-3-23.1, or 16-3-24[.]"

However, our review of the trial court's immunity order leads us to conclude that, in making its determination, the trial court conflated principles found in OCGA § 16-3-20 (2)[15] and (4),[16] which are not referenced in OCGA § 16-3-24.2, with self-defense under OCGA § 16-3-21, which is referenced in OCGA § 16-3-24.2. Specifically, the trial court relied on *State v. Hall*, supra, and concluded that the force used by the deputies "in the seizure and

---

[15] OCGA § 16-3-20 (2) provides that "the defense of justification can be claimed . . . [w]hen the person's conduct is in reasonable fulfillment of his duties as a government officer or employee[.]"

[16] OCGA § 16-3-20 (4) provides that "the defense of justification can be claimed . . . [w]hen the person's conduct is reasonable and is performed in the course of making a lawful arrest[.]"

24

arrest of [Martin]" was proportionate and "reasonably necessary."

In *Hall*, the Court of Appeals analyzed whether an officer's use of force was "reasonably necessary" to effectuate a detention and proportionate to the suspect's level of resistance in deciding whether the officer was entitled to immunity from prosecution under OCGA § 16-3-24.2. See 339 Ga. App. at 243-244. But whether officers used reasonable force in effectuating a lawful detention or arrest is a separate inquiry from whether their use of force was in defense of themselves or each other under OCGA § 16-3-21 (a) such that they were entitled to immunity under OCGA § 16-3-24.2. The proper inquiry in determining whether to grant such immunity is whether the force used by each of the deputies was based on his reasonable belief that

> such threat or force is necessary to defend himself . . . or a third person against such other's imminent use of unlawful force; however, . . . a person is justified in using force which is intended or likely to cause death or great bodily harm only if he . . . reasonably believes that such force is necessary to prevent death or great bodily injury to himself . . . or a third person or to prevent the commission of a forcible felony.

25

OCGA § 16-3-21 (a). Thus, regardless of whether the deputies' encounter with Martin was a first-, second-, or third-tier encounter, if Martin's conduct constituted an "imminent use of unlawful force," OCGA § 16-3-24.2 requires an analysis of the threat or force needed by the deputies to reasonably defend against such threat or force rather than a consideration of proportionality or reasonability of the deputies' conduct in the fulfillment of police duties. To the extent that the decision of the Court of Appeals in *Hall* conflicts with our analysis here, it is disapproved. Moreover, the trial court must apply the proper analysis to this question on remand.

(iv) Additionally, the immunity statute requires the trial court to inquire into the deputies' reasonable beliefs regarding the severity of the force being used by Martin and the degree of force needed to defend against it. To the extent that each deputy's own use of force was intended or likely to cause death or great bodily harm, the trial court must consider whether each deputy used such force based on his own reasonable belief that Martin was threatening imminent use of unlawful force intended or likely to

26

cause death or great bodily injury to the deputy or a third person or whether Martin was threatening a forcible felony. See OCGA § 16-3-21 (a).

To reach a proper conclusion on this issue, the trial court must consider the actions taken by Martin as well as the means used by each deputy to defend himself or his fellow deputies against Martin. In this case, the most prominent means of force employed against Martin were the TASERs used by the deputies at various times during the encounter with Martin. The trial court concluded, apparently based on expert testimony presented at the hearing on the immunity motions, that a TASER is "classified as a 'non-deadly' device." But that does not answer the question of whether, within the meaning of OCGA § 16-3-21 (a), a TASER (or multiple TASERs used in succession) could ever be used to inflict deadly force or whether they were intended or likely to do so in this case. As we have previously held, a TASER can be considered a deadly weapon in certain circumstances, see *Eberhart v. State*, 307 Ga. 254, 261 (2) (a) (835 SE2d 192) (2019), and whether the use of a TASER (or, for

27

that matter, any other object or device) constitutes a use of force that is intended or likely to cause death is a case-by-case determination that must account for how the device is used, how many times and for what duration, and under what circumstances. Even common objects that are not normally considered to be weapons (much less deadly weapons) can be employed in such a manner as to make them lethal. See, e.g., *Ballin v. State*, 307 Ga. 494, 495 (837 SE2d 343) (2019) (defendant used decorative statue to bludgeon victim to death); *Dasher v. State*, 285 Ga. 308, 311 (3) (676 SE2d 181) (2009) (evidence was sufficient to show that defendants' hands and feet were used as deadly weapons).

Here, the trial court appears to have simply and improperly adopted the expert testimony regarding the general classification for use of a TASER in a generic confrontation to conclude both that a TASER is, as a general matter, a "non-deadly device" and that the deputies' use of the TASERs in this case did not constitute a "use of force . . . intended or likely to cause death." While expert testimony may inform the deadly force determination, the trial court must also

consider the particular circumstances of this case, including the manner and duration of the deputies' use of the TASERs, the physical force used in the struggle between the deputies and Martin, and the fact that Martin died shortly after the repeated deployment of TASERs against him and the physical struggle.

(v) Finally, the trial court's order granted immunity to Deputies Copeland, Scott, and Howell collectively. This was improper because the trial court must make an individual assessment of each defendant deputy's immunity claim. The information available to each deputy informs the reasonableness of his respective belief about the lawfulness of Martin's threatened force and the necessity of any actions he took in alleged self-defense or defense of other deputies. While it appears that the deputies made observations and interacted with Martin close in time to one another, the information available to each deputy was not identical, and at least with respect to Deputy Scott, he appears to have acted in part on information he received from Deputies Howell and Copeland. Deputy Howell initially responded to the 911 call; Deputy

Copeland responded to Deputy Howell's request for backup; and Deputy Scott responded after hearing over the radio that Martin had been shot with the TASER but was "still fighting." These differences in perspective can only be properly accounted for by an individual assessment of each deputy's immunity claim by the trial court.

Accordingly, we vacate the trial court's judgments and remand the cases for reconsideration consistent with this opinion.

*Judgments vacated and cases remanded with direction. All the Justices concur, except Warren, J., not participating.*

Decided November 2, 2020.

Murder. Washington Superior Court. Before Judge Flanders, Senior Judge.
*S. Hayward Altman, District Attorney, Kelly J. Weathers, Assistant District Attorney*, for appellant.
*Fleming & Nelson, Pierce G. Blitch IV, Paul S. P. Williams*, for appellees (case nos. S20A0820 and S20AS20A0821).
*Hawk Law Group, Shawn M. Merzlak*, for appellee (case no. S20A0822).
*Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General*, amici curiae.