**THIRD DIVISION
DOYLE, P. J.,
REESE and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**February 8, 2022**

# In the Court of Appeals of Georgia

A21A1306. JOHNSON v. THE STATE.

BROWN, Judge.

A jury found James Allen Johnson guilty of aggravated assault, felony obstruction of a police officer, and misdemeanor obstruction of a police officer.[1] Johnson contends that his convictions should be reversed because the State failed to prove that a deputy sheriff was acting within the lawful scope of his duties. For the reason explained below, we affirm his aggravated assault conviction and reverse his misdemeanor obstruction conviction.

On appeal from a criminal conviction, we view the evidence in the light most favorable to the verdict, with the defendant no longer enjoying a presumption of innocence. We neither weigh the evidence nor judge the

---

[1] After receiving the jury's guilty verdict on all three counts, the trial court merged the felony obstruction of an officer count into the aggravated assault count.

credibility of witnesses, but determine only whether the evidence was sufficient for a rational trier of fact to find the defendant guilty of the charged offense beyond a reasonable doubt.

(Citations and punctuation omitted.) *Smith v. State*, 348 Ga. App. 643, 644 (824 SE2d 382) (2019). So viewed, a POST certified deputy testified that he was on patrol when he received a dispatch to Caldonia Street based upon a 911 call stating that a subject fit the description of someone having an active arrest warrant for grand theft auto. In the 911 call, the caller gave his first and last name, as well as his phone number. He stated that he was calling because, "I just seen a guy on the corner of Lafayette Drive and Caldonia Street and I went to Mapco and they had a picture up of a guy that was wanted for grand theft auto and I swear it's the dude. . . . He's on foot. . . . It's a dead-on match." When asked to describe him, the caller stated that he was a white guy, "wearing a ball cap, I believe it's blue, got on some khaki shorts, and a dark colored t-shirt."

When the deputy first arrived in the area approximately 11 minutes after the 911 call was placed, he "turned on Caldonia Street and made [his] way down to Lafayette Drive," but did not see anyone. When he circled back around to Caldonia, he saw Johnson walking down the roadway, wearing clothing similar to the description he had

2

received from dispatch. Johnson was the only person walking in the area. At this point, the deputy planned to stop, identify himself, and ask Johnson for identification to determine if he had an active arrest warrant. If he had no active warrant, the deputy testified that Johnson would have been free to go.

When the deputy stopped his marked patrol car, Johnson was about 20 yards away and walking toward him. He explained that they do not normally begin a conversation with "hey, we think you have felony warrants. We like to be able to identify that person and go from there." The deputy, who was wearing his uniform, testified that he told Johnson that he was with the sheriff's office and had received "a call about him in the area, a suspicious person in the area." Johnson, who was looking at his phone, ignored the deputy and continued walking. When Johnson was directly beside the deputy, the deputy told him that he needed to see his identification. After Johnson stepped past the deputy, he asked Johnson "to stop and to quit walking away from me and provide his ID." Johnson took several steps and then "took off running."

The deputy chased Johnson down the street and through side yards onto an adjacent street. Throughout the chase, the deputy continued to command him to stop and get on the ground. The deputy unsuccessfully deployed his taser during the chase. After Johnson tripped and fell, the deputy tackled him to the ground as Johnson

attempted to regain his footing. The deputy and Johnson then engaged in a physical altercation in which Johnson repeatedly struck the deputy while the deputy "attempt[ed] to get his hands behind his back to place him in handcuffs." "Early into the altercation," the deputy felt a sharp pain on his left wrist and noticed a lot of blood on his arms. At one point, Johnson was "turned around" as the deputy "still had a hold of him," and the deputy saw Johnson strike his leg twice. The deputy initially thought that Johnson was bleeding and did not realize that Johnson had stabbed him with a knife. The deputy saw the knife for the first time while Johnson attempted to stab him in the face or neck. The deputy blocked the knife with his hand, rolled away, pulled his service weapon, and fired twice, hitting Johnson each time. While holding the weapon on Johnson, the deputy realized that blood was pouring from his leg. A few minutes later, other police officers arrived, and both the deputy and Johnson were transported to the hospital. The deputy learned he was stabbed twice in the leg, once in the arm, and also had cuts on his hand and left shoulder. The deputy testified that he did not recall ever choking Johnson and described him as "extremely violent. He clearly showed that he did not want to be taken into custody."

During cross-examination, the deputy acknowledged that he did not know anything about the person who made the 911 call or the wanted poster, such as the

4

wanted person's name, type of car that had been stolen, when the car had been stolen, whether a warrant for arrest actually existed, how old it might have been, whether the person had already been arrested, and whether the wanted poster was based upon an active arrest warrant or someone wanted for questioning who was a witness to a crime. He responded to the scene based only upon the dispatch he received.

Based upon the use of force by the deputy, the GBI investigated this case. A GBI agent testified that he interviewed the citizen who made the 911 call, and a recording of this interview was played at trial. In this interview, which took place a little over two hours after the incident, the caller stated,

> I went up to the top of the hill to purchase some cigarettes at my local Mapco. . . . The lady there . . . had told me once before that a guy had stole a car out there you know don't leave my keys running. . . . That was about a month ago when she told me about that. Well today, she actually had a picture of the guy and . . . I was [like] can I see the picture and she was like sure so she showed me the picture. And I was on my way home . . . as I turned in . . . off Lakeview here on Caldonia, I saw a suspicious looking guy standing there on his phone. . . . I tooted my horn a little bit to get him to look up. He looked dead at me and it was the exact same guy I had just seen the picture of. . . . As a concerned citizen and knowing that this guy's a thief, I don't want him in my neighborhood. So I called my local authorities, 911 . . . at 4:48.

The caller explained that he saw the man again five or six minutes after talking to 911 and that his description of a dark shirt was either incorrect or the man had changed. When he saw him the second time, the man was still messing with his phone and wearing a short-sleeved, khaki shirt, black ball cap, green "khakish" shorts. He stated that when he saw the man a second time, he was walking down Lakeview, away from Caldonia, towards Nason. He explained that he had seen the man several times before on the side of the Mapco building charging his phone. The caller confirmed to the GBI agent that the man was "on a wanted picture" at the Mapco.

A GBI agent testified that he "didn't see the [flyer]" and agreed that the State's case did not include a claim that Johnson was the car thief or that he had pending theft by taking charges. He explained that he "never got to that point." The caller did not testify at trial.

In a recorded interview, Johnson stated that as he was walking down the road, the deputy stopped, and said "hey, hey, hey." Johnson stated that he was just walking and "the next thing [he] knew," the deputy was running after him and started tasing him. When Johnson spun around, the deputy tackled him. According to Johnson, he had his knife open while he was walking because he uses it to clean his nails and he "reckoned" the deputy got hit with the knife when he tackled him. The deputy then

6

threatened to kill him, started "beating the shit" out of him, and the next thing he knew the deputy started shooting him. Johnson denied running until the deputy tried to tase him. During the interview, Johnson acknowledged that he previously had stated that he ran when the deputy asked for identification because he knew he had outstanding warrants. He denied stabbing the deputy to get away, but admitted that the knife was still in his hand while they were scuffling.

The State introduced evidence that Johnson was subject to arrest for a contempt order based upon his failure to pay child support. A paramedic who responded to the scene testified that Johnson told him "he was getting warrants served on him and he needed to use the restroom. The officer declined his request and he stabbed the officer." The paramedic did not notice any signs that Johnson "had been hit or beaten or anything like that." The State did not take any photographs of Johnson or collect any of his clothing.

The State charged Johnson with aggravated assault of the deputy with a knife while the deputy was "engaged in the performance of [his] official duties," OCGA § 16-5-21 (c) (1), felony obstruction of an officer for stabbing the deputy while he was "in the lawful discharge of [his] official duties," OCGA § 16-10-24 (b), and

7

misdemeanor obstruction for running away after being given a lawful verbal command to stop, OCGA § 16-10-24 (a).

On appeal, Johnson asserts that "the jury verdicts" in this case should be reversed based on insufficient evidence because the deputy was not acting within the lawful scope of his duty. A claim of insufficient evidence to support a conviction that a trial court has merged into another conviction for sentencing purposes is moot. *McIntyre v. State*, 312 Ga. 531, 534 (1), n.5 (863 SE2d 166) (2021). We will therefore only consider the sufficiency of the evidence with regard to Johnson's misdemeanor obstruction and aggravated assault convictions.

1. Johnson contends that insufficient evidence supports his misdemeanor obstruction conviction because the deputy gave him an unlawful command to stop. "It is well settled that detaining or arresting a person without authority to do so under the law does not constitute the lawful discharge of the duties of a law enforcement officer, and, therefore, one who resists an unlawful arrest or detention does not commit the offense of obstruction." *Glenn v. State*, 310 Ga. 11, 25 (1) (c) (849 SE2d 409) (2020). Therefore, we first must determine whether the deputy's actions were lawful during his interaction with Johnson, as well as Johnson's right to end the encounter.

8

[W]hen we analyze police-citizen encounters and determine whether defendants could lawfully leave those encounters, we follow *Terry v. Ohio*, 392 U. S. 1 (88 SCt 1868, 20 LE2d 889) (1968). For example, in *State v. Dukes*, 279 Ga. App. 247, 249 (630 SE2d 847) (2006), we applied the *Terry* analysis for two purposes: to determine whether the officers were engaged in lawful duties and also to determine whether their initial encounter with the defendant was a second-tier or first-tier encounter from which the defendant could lawfully flee.

(Citation omitted.) *Thomas v. State*, 322 Ga. App. 734, 737 (2) (b) (746 SE2d 216) (2013). Under *Terry*, "there are at least three types of police-citizen encounters: verbal communications that involve no coercion or detention; brief stops or seizures that must be accompanied by a reasonable suspicion; and arrests, which can be supported only by probable cause." (Citation and punctuation omitted.) *State v. Copeland*, 310 Ga. 345, 351 (2) (b) (850 SE2d 736) (2020). See also *Thomas*, 322 Ga. App. at 737 (2) (b).

Under this analysis, if the encounter between [Johnson] and [the deputy] was a first-tier encounter — involving no detention but simply communication — then [Johnson] had the right to walk away. A citizen's ability to walk away from or otherwise avoid a police officer is the touchstone of a first-tier encounter. Even running from police during a first-tier encounter is wholly permissible. If the encounter between [Johnson] and the [deputy] was a second-tier encounter — involving a lawful attempt to seize [Johnson] briefly — then [Johnson] could not lawfully flee.

9

(Citations and punctuation omitted.) *Thomas*, 322 Ga. App. at 737 (2) (b). "[A] police-citizen encounter rises to the level of a second-tier investigatory stop if the officer restrains the citizen's movement by physical force, command, or show of authority." (Citation and punctuation omitted.) *Durden v. State*, 320 Ga. App. 218, 220 (1) (739 SE2d 676) (2013). In this case, we therefore must determine whether the deputy had a reasonable suspicion authorizing him to command Johnson to stop as he walked past the deputy during their initial encounter. Id. (where officer called out to defendant as he was walking away and told him to stop so he could speak with him, encounter between the officer and defendant rose to second tier).

"If police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* . . . stop may be made to investigate that suspicion." (Citation and punctuation omitted.) *Perkins v. State*, 360 Ga. App. 782, 783 (1) (a) (861 SE2d 621) (2021). "[R]easonable, articulable suspicion need not be based on an arresting officer's knowledge alone, but may exist based on the collective knowledge of the police when there is reliable communication between an officer supplying the information and an officer acting on that information." (Citations and punctuation omitted.) *Hall v. State*, 351 Ga. App. 695, 700 (1) (832 SE2d 669) (2019).

10

Although the primary means by which officers acquire reasonable suspicion is personal observation, information acquired from an informant that exhibits a sufficient indicia of reliability can also be the basis for reasonable suspicion. If the informant is a "concerned citizen" as that term is used in our precedents, the information provided to the police is presumed to be reliable. . . . Generally, as the terminology itself implies, we have distinguished a concerned citizen from an anonymous tipster by the fact that the identity of the citizen is known to the police.

(Citations and punctuation omitted.) *Durden*, 320 Ga. App. at 221-222 (1). As a sister court has explained, a concerned citizen tip is considered reliable when identifying information is provided because the citizen informant may be subject to penalty for providing false information. *State v. Prows*, 178 P3d 908, 912 (I) (A) (Utah Ct. App. 2007). See also *Florida v. J. L.*, 529 U. S. 266, 270 (120 SCt 1375, 146 LE2d 254) (2000) ("Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, . . . an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.").

In this case, even if we accept that the information provided by the concerned citizen was true and reliable, the information conveyed must also amount to a reasonable articulable suspicion. Cf. *Heitkanp v. State*, 342 Ga. App. 674, 678-679 (1)

11

(804 SE2d 702) (2017) (holding that even if informant were to be deemed a reliable source, information provided was insufficient to establish probable cause to enter a home without a warrant). In this case, the deputy acted upon a dispatch relaying information from a 911 call about the location of a man who the citizen reported was a "dead-on match" for a man wanted for "grand theft auto." While our research has not revealed any Georgia opinions addressing a similar fact scenario, guidance can be found in *United States v. Hensley*, 469 U. S. 221 (105 SCt 675, 83 LE2d 604) (1985). In *Hensley*, the Supreme Court concluded:

> If a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information. If the flyer has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment. . . . It is the objective reading of the flyer or bulletin that determines whether other police officers can defensibly act in reliance on it.

(Citations omitted.) Id. at 232-233 (II) (B). In this case, the State presented no evidence of the wanted flyer, much less evidence showing a reasonable, articulable suspicion to

12

believe that Johnson had committed a crime involving "grand theft auto."[2] We therefore find that the deputy was not acting within the lawful discharge of his duties when he commanded Johnson to stop and that insufficient evidence supports Johnson's misdemeanor obstruction conviction. See *Joshua v. DeWitt*, 341 F3d 430, 440 (B) (1) (6th Cir. 2003) (holding officer could not reasonably rely on information in "Read & Sign" logbook from another police agency where no evidence was presented showing that the other agency had a reasonable suspicion that the defendant was involved in criminal activity).

2. Johnson contends that his aggravated assault conviction must also be reversed. We disagree. His "common-law right to resist an unlawful arrest or detention" extends only to a "proportionate use of force necessary to resist the force used to arrest or detain a person. . . ." *Glenn*, 310 Ga. at 23-24 (1) (b). Based on the particular facts and circumstances of this case, a rational trier of fact could conclude that Johnson's use of a knife to resist arrest was a disproportionate use of force.

*Judgment affirmed in part and reversed in part. Doyle, P. J., and Reese, J., concur.*

---

[2] The fact that Johnson was later discovered to be subject to arrest for contempt based upon his failure to pay child support is not relevant to our analysis.