**FIRST DIVISION
BARNES, P. J.,
GOBEIL and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**July 1, 2024**

# In the Court of Appeals of Georgia

A24A0107. TERRY v. THE STATE.

PIPKIN, Judge.

Appellant Joseph Daniel Terry appeals his conviction for the misdemeanor offense of obstruction of an officer. See OCGA § 16-10-24 (a). We agree with Appellant that the State failed to meet its burden of proof and, thus, that the trial court erroneously denied his motion for a directed verdict. Accordingly, we reverse the judgment of conviction.

1. The record before us shows that Appellant was indicted for the offense of felony obstruction of an officer. See OCGA § 16-10-24 (b). The indictment alleged that Appellant "knowingly and willfully oppos[ed] Billy Fuller, a law enforcement officer . . . in the lawful discharge of his official duties by offering to do violence to said person, by advancing in an aggressive manner towards said officer while holding a

baseball bat." At Appellant's April 2023 trial, the State presented the testimony of Officer Fuller, as well as various video recordings from the night in question. When viewed in the appropriate light, see *Coalson v. State*, 237 Ga. App. 570, 570 (515 SE2d 882) (1999), the State's evidence established as follows. In the early morning hours of August 4, 2019, Officer Fuller was parked in his patrol car in Rockmart, Georgia. At approximately 2:15 a.m., an officer from another jurisdiction who was traveling through the area asked on the police radio whether officers were familiar with "a man and woman [who] walk[] around town carrying a baseball bat." According to the radio call, that officer observed a man with a baseball bat -- later identified as Appellant -- "and a guy on a bike and a female" traveling on a sidewalk near a well-known business called "House of China." While an officer can be heard remarking on the radio that the man was "probably just playing a little night ball," Officer Fuller and a second officer responded to "check it out."

Officer Fuller encountered the trio as he drove south on the road on which the trio was traveling north. When Officer Fuller arrived in the area, "the only thing [he] saw them doing was walking on the sidewalk," though he also testified that it was unusual for someone to be walking through the area with a baseball bat at that time of

2

day. The officer explained that the trio remained on the sidewalk, that they were not on private property or near any vehicles, and that the trio were neither bothering nor threatening anyone. When the officers arrived at Appellant's location, Officer Fuller and the second officer pulled their respective cars alongside the curb with their passenger doors toward the side walk. While both officers and their respective vehicles were equipped with cameras, none of those cameras were turned on by the officers during their initial encounter with Appellant. As to that encounter, Officer Fuller testified as follows:

> [Officer Fuller]: So I arrived on location just to basically an interview, so an investigatory -- an investigative detention as to what was going on.[1]

> [Prosecutor]: All right.

> [Officer Fuller]: I had just been called by [the reporting officer] in reference to [Appellant] being around the House of China, so they could've possibly broke into it. So I'm using it as an investigative detention. I pull up. As I pull up, I turn on my takedown lights, which is the two bright white lights that come on in front of the light bar on top of the car, and I flip on the cruise lights. The cruise lights are on the end, so they just light up blue. They're not flashing. There's no siren. Uh, I step out of the car. As I step out of the car, I tell [Appellant] to drop the bat.
> [Prosecutor]: At that point, how far away from him were you?

---

[1] The area in which this incident occurred is, at least in part, residential.

3

[Officer Fuller]: Probably 15 yards from the front of my car.

[Prosecutor]: Okay. So 15 yards --

[Officer Fuller]: 30 feet.

[Prosecutor]: -- roughly, roughly 30 feet?

[Office Fuller]: (Nodded head in the affirmative). So I give him the command to drop the bat. He says fuck you and continues to walk toward me.

[Prosecutor]: Now, did -- did you initiate the cursing or did he?

[Officer Fuller]: He did.

[Prosecutor]: All right. Go ahead.

[Officer Fuller]: He continues walking towards me, says fuck you to me, so I had pulled my duty weapon out of my holster and I've got it down by my side.

[Prosecutor]: Now, why did you do that?

[Officer Fuller]: Well, the short distance as it is, he can close that distance and hit me with the bat prior to me being able to unholster. So --

[Prosecutor]: Okay.

[Officer Fuller]: -- unholster and I'm holding it at my side. I don't think he can even see it because there's now a car in between us. He's at the front end of my car by this point, and I'm moving to the back end of my car, again, giving him the verbal command to drop the bat. Fuck you. He makes it from there to the rear of my car. I again: drop the bat. No

4

cursing. Fuck you. At this point, he's made it to the back of my car and he's turned parallel with me. There's no barrier in between us anymore. At this point, he can -- he can do some serious damage with that bat with the short distance that we are. I made the determination, I pointed my duty weapon at him and gave him another verbal command to drop the bat. At that time, he flipped the bat. He didn't swing it at me. He didn't overhand throw it like a baseball. He flipped it at me.

[Prosecutor]: All right. I want to go back up and go through this. So you said originally y'all were about 30 feet?

[Officer Fuller]: That's, yeah, from the front of my car, so -- and I'm on the other -- on the driver's side of my car.

[Prosecutor]: Okay. And how is he carrying the bat?

[Officer Fuller]: Just at his side.

. . . .

[Prosecutor]: Okay. Now, let's be clear. He never raised the bat?

[Officer Fuller]: He did not.

[Prosecutor]: But he flipped the bat towards you?

[Officer Fuller]: Yes.

[Prosecutor attempts to flip the wooden baseball bat but breaks it]

[Prosecutor]: Okay. Now, at that point, what's going through your mind?

[Officer Fuller]: I, at this point, I've already made the determination that he's under arrest for obstruction. I gave him four chances to drop the bat. I'm in a marked police unit. I'm in uniform. I'm a -- that's enough identification in my eyes to say the police gave you a lawful order. At that point, he's -- and he's made me raise my duty weapon at him. He was going to jail for obstruction.

After flipping the bat, Appellant was instructed to put his hands behind his back, but he failed to comply; according to Officer Fuller, Appellant took a "fighting stance" and was subsequently "tased." It was during this portion of the altercation that the officers' cameras were engaged.[2]

Later during his direct testimony, Officer Fuller addressed the "legal duty" he was performing at the time that he approached Appellant, stating as follows:

[Officer Fuller]: Um. All right. So it's considered an ARS stop.

[Prosecutor]: Explain that.

---

[2] One of the recordings captured Officer Fuller stating as follows after Appellant was "tased" and placed under arrest:

[The reporting officer] clicked over to our channel . . . as he was passing down through here. Sees this dude walking down the street carrying a bat. So, I pull up on him. He's yelling and screaming as soon as I pull up. So, I give verbal commands for him to drop the bat. He starts walking towards the car, he's like, "fuck you, duh duh duh." So, I'm like [gestures pulling his firearm] "drop the bat." After I point it at him, he decides to drop the bat.

[Officer Fuller]: Articulable reasonable suspicion, that there is a crime that's possibly happened or its going to happen.

[Prosecutor]: Okay.

[Officer Fuller]: At that point [after learning] . . . that [Appellant had been seen] around the House of China, I don't know if he's broke into it. I'm going to stop him, talk to him. If I had been given the opportunity to send somebody down to the House of China to see if it had been broken into, while talking with Mr. Terry, if he had gave me the opportunity, why are you walking around at two o'clock in the morning with a baseball bat? Had he of given me a good reason: I'm afraid a dog's going to attack us. Thank you, sir. Have a nice day. He never gave the opportunity to go from an ARS. He went from ARS to probable cause.

On cross-examination, Officer Fuller acknowledged that there had been no radio traffic indicating a break in at the House of China or any where else in the vicinity. In fact, the officer acknowledged that he was simply acting "with a hunch" and that his sole focus during the stop was on Appellant to the exclusion of the other two individuals. The individual on the bike rode away during the incident because he was not asked to stop, and officers commanded the woman to leave the scene without any further investigation. Also during cross-examination, Officer Fuller clarified his earlier testimony concerning Appellant's path of travel, explaining as follows:

[Defense counsel]: . . . . And so when you wrote in your report and said yesterday [that Appellant] continued walking toward my direction, is this what you mean, that they're continuing to walk north?

7

[Officer Fuller]: Yes.

[Defense counsel]: Okay. It gets a little -- it's hard to describe in words, isn't it? right

[Officer Fuller]: (Nodded heard in the affirmative)

[Defense counsel]: Most of the time when we think somebody is walking in our direction, we think they're like walking directly face to face toward us.

[Officer Fuller]: Right

[Defense counsel]: So I want to clarify and make sure I understand. Okay? That's not what you meant when you said that?

[Officer Fuller]: No ma'am. I meant they were walking in my direction with -- my car was in between us.

. . . .

[Defense Counsel]: So, they're coming in your direction, but they're not coming at you?

[Officer Fuller]: Right.

Officer Fuller also clarified on cross-examination that Appellant was holding the bat in a downward direction by his side and that the bat was swinging "down next to [Appellant's] right leg" like "one would swing your arms when you walk."

2. We now turn to Appellant's assertion that the State failed to meet its burden of proving the offense of obstruction of an officer. Under OCGA § 16-10-24 (b), felony obstruction of an officer is committed whenever one "knowingly and willfully resists, obstructs, or opposes any law enforcement officer . . . in the lawful discharge of his or her official duties by offering or doing violence to the person of such officer." The misdemeanor offense is committed when "a person who knowingly and willfully obstructs or hinders any law enforcement officer . . . in the lawful discharge of his or her official duties." OCGA § 16-10-24 (a). As the Georgia Supreme Court has explained, "[b]y its express terms, OCGA § 16-10-24 applies only when the defendant obstructs or hinders a law enforcement officer '*in the lawful discharge of his or her official duties*.'" (Emphasis in original.) *Glenn v. State*, 310 Ga. 11, 25 (1) (c) (849 SE2d 409) (2020). Thus, under either the greater or lesser offense, "the State must prove that the officer was in the lawful discharge of his official duties at the time of the obstruction." (Citation and punctuation omitted.) *Bacon v. State*, 347 Ga. App. 689, 690 (820 SE2d 503) (2018). Indeed, "[i]t is well settled that detaining or arresting a person without authority to do so under the law does not constitute the lawful discharge of the duties of a law enforcement officer, and, therefore, one who resists

9

an unlawful arrest or detention does not commit the offense of obstruction." *Glenn*, 310 Ga. at 25 (1) (c).

To determine whether Appellant obstructed Officer Fuller here, "we first must determine whether [Officer Fuller's] actions were lawful during his interaction with [Appellant], as well as [Appellant's] right to end the encounter." *Johnson v. State*, 363 Ga. App. 12, 16 (1) (869 SE2d 177) (2022). We consider this question by applying the framework created by *Terry v. Ohio*, 392 U. S. 1 (88 SCt 1868, 20 LE2d 889) (1968). See *Johnson*, 363 Ga. at 16 (1). Under this framework,

> there are at least three types of police-citizen encounters: verbal communications that involve no coercion or detention; brief stops or seizures that must be accompanied by a reasonable suspicion; and arrests, which can be supported only by probable cause.
>
> In a "first-tier" encounter, officers may approach citizens, ask for identification, and freely question the citizen without any basis or belief that the citizen is involved in criminal activity, as long as the officers do not detain the citizen or create the impression that the citizen may not leave. So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required. Importantly, an officer may not use force to effectuate a first-tier encounter as an officer in such an encounter has no authority to detain or restrict the liberty of a citizen, and the citizen has the right to withdraw from the encounter or resist any such use of force with a proportionate use of force.

In a "second-tier" encounter, when an officer develops a reasonable, articulable suspicion that the citizen is committing or has committed a crime, the officer then has the authority to detain the citizen for an investigative stop, or what has come to be known as a "Terry stop." In a second-tier encounter, the suspect's physical resistance to his detention is unlawful. In a second-tier encounter, the officer may also take reasonable steps to protect his safety and the safety of others while detaining the individual.

In a "third-tier" encounter, when an officer has probable cause to believe that an individual is committing or has committed a crime, the officer is authorized to make an arrest and take the individual into custody. When an officer with probable cause seeks to arrest an individual, that person is not free to flee or resist the arrest, although he retains the right not to speak with the officer.

(Citations, punctuation, and footnote omitted.) *State v. Copeland*, 310 Ga. 345, 351-352 (2) (b) (850 SE2d 736) (2020). Only the first-two tiers are relevant here, and we address each in turn.

(a) To the extent that Officer Fuller's encounter with Appellant was a first-tier encounter -- that, is, that Officer Fuller merely intended to question Appellant about his presence in the area with a baseball bat -- Appellant would have been entitled to ignore the officer's questions, disregard his commands, and walk away; Appellant's exercise of those rights does not amount to obstruction. See *Ewumi v. State*, 315 Ga. App. 656, 662-663, (1) (a) (727 SE2d 257) (2012) (defendant walking around an

apartment complex in a high-crime area around midnight not required to stop and speak with officer who was in the area investigating a shooting that resulted in a bullet entering a residence; thus, defendant was not guilty of obstructing an officer by failing to answer the officer's question or running away).[3] Cf. *Black v. State*, 281 Ga. App. 40, 44 (1) (635 SE2d 568) (2006) ("[A] citizen's ability to walk away or otherwise avoid a police officer is the touchstone of a first-tier encounter. Even running from police during a first-tier encounter is wholly permissible." (Citation and punctuation omitted.)).

Relying on nothing more than broad language discussing protective searches under *Terry*, the State argues that Officer Fuller was entitled to immediately demand that Appellant drop the bat as a matter of officer safety during this first-tier encounter. However, the *Terry* court explained that an officer is authorized to engage to pat down a citizen for safety "to *discover* guns, knives, clubs, *or other hidden instruments* for the assault of the police officer." (Emphasis supplied.) *Terry*, 392 U.S. 1, 29 (IV). The

---

[3] The State asserts that *Ewumi* is inapposite because, according to the State, "[t]he case is based on the denial of a pretrial motion to suppress that the trial court denied. No such motion was brought in this case." The State's assessment of *Ewumi* is incorrect; instead, the appeal follows the defendant's convictions for, among other things, felony obstruction of an officer. *Ewumi*, 315 Ga. App. at 656. Further, both cases require the same application of the *Terry* framework.

baseball bat here was certainly not hidden. Nevertheless, even if we were to accept the State's implicit extension of *Terry* -- that is, that Officer Fuller was entitled to demand Appellant drop the baseball bat for officer safety during a supposed first-tier encounter -- the State's argument is still unavailing under these circumstances. It is patent that Appellant did not wish to engage with police on the night in question, and the State has offered no legal authority suggesting that a police officer may search for or secure weapons as part of what could only be described as a "non-consensual" first-tier encounter; indeed, such a legal position turns a first-tier encounter on its head.[4]

---

[4]Further, whatever officer safety measures are permitted under *Terry* during a first-tier encounter, those measures are authorized only where "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U. S. at 27 (III). The State fails to address this requirement, and we can find no evidence that would warrant a belief that anyone was in danger. The undisputed evidence shows that, before parking his patrol vehicle, the officer observed nothing more than an individual walking down a sidewalk with two other individuals while carrying a wooden baseball bat in a relaxed and non-threatening way. While it is unquestioned that Officer Fuller immediately unholstered his duty weapon and ultimately pointed it at Appellant, it is not the officer's subjective beliefs that we use to evaluate danger; again, it is the "reasonably prudent" individual standard. Here, though Appellant may have used profanity, he did nothing more than continue to walk on the sidewalk parallel to the officers' vehicles while carrying the baseball bat by his side until he was forced to comply with the officer's demand at gunpoint.

To the extent that these facts establish a first-tier encounter, we conclude that Officer Fuller was not entitled to command Appellant to drop his baseball bat and that Appellant's temporary continued march down the sidewalk did not amount to the obstruction of a police officer.

(b) We now look to whether Officer Fuller's actions were warranted as part of a second-tier encounter, better known as a "Terry" stop. At trial, Officer Fuller himself characterized his interaction with Appellant as second-tier encounter, explaining that it was an "[a]rticulable reasonable suspicion" stop. However, as explained above, this kind of investigative stop would have been warranted only if Officer Fuller had developed a reasonable, articulable suspicion that Appellant was committing or was about to commit a crime. Here, Officer Fuller merely testified that it was unusual to see someone walking in the area with a baseball bat at that time of day, that he did not know if Appellant had "broken into" the House of China, and that he had a "hunch" about Appellant.[5] These circumstances are insufficient to create reasonable suspicion. See, e.g., *Runnells v. State*, 357 Ga. App. 572, 576 (1) (851

---

[5] The State points to no evidence, and we have found none, suggesting that this was a high-crime area or that Appellant was in the vicinity of a location known for criminal activity.

14

SE2d 196) (2020) (recognizing the well-established principle that "[a] reasonable suspicion is more than a subjective, unparticularized suspicion or hunch" (citation omitted)). Indeed, neither Officer Fuller nor the State has articulated any offense that Appellant was suspected of committing or had committed at the time Officer Fuller arrived on the scene, and the mere fact that Appellant was cursing and agitated does not amount to reasonable suspicion. See *State v. Tollefson*, 259 Ga. App. 320, 322-323 (1) (b) (577 SE2d 21) (2003) (in the absence of officers identifying a criminal offense that the defendant had committed or was about to commit, defendant's cursing and agitation did not create reasonable suspicion).

Finally, the State asserts that "once [Appellant] began to curse at the officer and continue to walk towards him while refusing to drop the bat and cussing loudly at [Officer] Fuller, [Appellant] committed the crimes of disorderly conduct and obstruction of an officer and was subject to arrest at that moment." (Punctuation omitted.) However, as established above, Officer Fuller's encounter remained a first-

tier encounter,[6] and this type of defensive behavior "would be consistent with [Appellant's] right to decline any contact from the police at that point in the encounter." *State v. Copeland*, 310 Ga. at 354 (2) (c) (ii) (defendant entitled to take a "defensive stance" in response to a first-tier encounter, and such conduct would not "provide a law enforcement officer with a reasonable articulable suspicion necessary to escalate the encounter to a *Terry* stop").

For these reasons, the State's evidence was insufficient to warrant a conviction for misdemeanor obstruction of a police officer, and the trial court erred when it denied Appellant's motion for a directed verdict. Accordingly, Appellant's judgment of conviction is reversed.

*Judgment reversed. Barnes, P. J., and Gobeil, J., concur.*

---

[6] Because the stop remained a first-tier encounter, the State's reliance on *Richardson v. State*, 239 Ga. App. 345 (521 SE2d 239) (1999), is misplaced. In that case, law enforcement had reasonable suspicion to detain the defendant and, further, the arresting officer articulated a reasonable basis to detain the defendant to conduct a search for weapons. See Id. at 346.