A07A1379. ESSUON v. THE STATE.
(650 SE2d 409)

PHIPPS, Judge.

Kwame Essuon appeals his convictions on two counts of criminal solicitation to commit a felony (the underlying felony in this case being murder). He challenges the sufficiency of the evidence and the legality of his sentences, and he contends that the court erred in failing to instruct the jury on the definitions of "felony" and "murder" as essential elements of the crime charged. Although we find the evidence sufficient, we are compelled to reverse Essuon's convictions based on his complaint concerning the jury charge. Issues relating to sentencing are, therefore, moot.

The state's lead witness, Willie Remone Oglesby, had known Essuon for several years. Their degree of familiarity was such that Oglesby called Essuon "Black," and Essuon at times called Oglesby "Mone." In a telephone conversation, Essuon told Oglesby that he had a matter he wanted to discuss with him in person. Oglesby testified that when he later went to Essuon's house, Essuon asked for his assistance in "taking Steven [Sheffield] out" in order to send a message to him and everyone else that "[t]his was where he was basically drawing the line at." Oglesby further testified, "And when I said taking Steven out, he wanted me to kill Steven for him." According to Oglesby, Essuon, knowing that Oglesby had wartime military experience, specified that he wanted him to kill Sheffield with one gunshot to the chest. Oglesby testified that he ended the meeting by leading Essuon to believe that he was going to evaluate the feasibility of killing Sheffield and then telling Essuon that he would get back to him.

Instead, Oglesby contacted law enforcement authorities and told them what had occurred. At the request of Charles Sullenger (a special agent with the Georgia Bureau of Investigation (GBI)), Oglesby placed a telephone call to Essuon, a recording of which was played to the jury. The jury then heard a recording of another conversation between Oglesby and Essuon, followed by a recording of a later conversation between Oglesby, Essuon, and Michel Washington (an undercover GBI agent) at Essuon's home.

During the second conversation between Oglesby and Essuon, Oglesby raised the matter of "Stevie." Oglesby later asked Essuon, "what kind of time frame you want this done in?" Essuon responded, "whatever convenient for all sides. You know — you know what I'm saying? Cause I already know, you know, you know all the ins and outs of this. . . . ." Oglesby then informed Essuon, "I can do it, you know, anytime next week. . . . I'll call my homeboy from North Carolina. . . . He at Fort Bragg. . . . He gonna go to Iraq." Oglesby then cautioned Essuon, "we ain't talking about no bullshit now. I'm talking about, don't say shit to nobody. You know what I'm saying? I'm giving you my — putting my life in your hands." To that, Essuon responded, "I feel you, man." Essuon later commented to Oglesby, "I got some cats from Atl that would come down, and they'd do it. But they [don't] really know their way around here. . . ." And afterward Oglesby told Essuon that "[i]t's gonna be dark, so that — that red shows everything. Look like daylight." Oglesby explained to the jury that in the street slang, he was telling Essuon that he planned to kill the intended victim at night with a gun equipped with an infrared scope.

Oglesby later returned to Essuon's residence with Washington. The recording of the conversation between the three of them showed that Oglesby introduced the undercover agent to Essuon as "Nick," saying, "Hey, Black, this my boy Nick I mentioned to you. Nick, this is Black. This is my partner. He's like a brother now." Oglesby then said, "[i]t's time to move[,]" and Washington then advised Essuon to keep two or three people with him during the entire day. Essuon said that he would. After Washington told Essuon that they would need a down payment, Essuon responded, "[C]heck back with me in about an hour or so. I'll be able to put like five on it. . . . I mean, what y'all want for the whole thing?" Washington responded, "Fifteen," and Essuon agreed. Oglesby explained to the jury that, in street slang, five and fifteen meant $500 and $1,500 respectively. Shortly thereafter, Oglesby and Washington left, telling Essuon they were going to "ride out there and peep him one more time."

Instead, they went back to Agent Sullenger's office. A couple of hours later, Oglesby and Washington met back with Essuon at an apartment complex. After they arrived, Essuon appeared on the scene, approached their car, and engaged them in another conversation. A recording of that conversation showed that Essuon thereupon informed Oglesby and Washington, "I got $4.00, you know what I'm saying? I mean, the money good. You know what I'm saying? My thing is, you know what I'm saying, I'm kind of putting my neck on line cause I don't know if shit gonna jump off. You know what I'm saying?" Washington then assured Essuon, "It's gonna go man. You tell me what you want done to him." Essuon responded, "me and Mone already discussed it." Essuon later said, "I really want to do it myself,

but you know my situation." Essuon subsequently gave money to Oglesby. At that time, Washington informed Essuon that "[i]t's gonna be up close and personal now" and asked whether Essuon wanted him "to tell [Stevie] anything." Essuon responded, "It's all G[,]" meaning "good." Oglesby and Washington then left the apartment complex.

The indictment charged Essuon with two counts of criminal solicitation to commit the felony of murder based on allegations that he had asked Oglesby to kill Sheffield during their initial meeting and that, at their next meeting, he had solicited Washington to commit murder by hiring him to kill Sheffield. Washington, as well as Oglesby, testified at trial. In closing, defense counsel argued that because there was nothing explicitly said in any of the parties' recorded conversations about a murder or killing, the state's case turned on the testimony of Oglesby, who had made conflicting statements and was not a credible witness.

As to the offense of criminal solicitation, the trial court read the allegations of the indictment to the jury; and, in accordance with OCGA § 16-4-7 (a), the court charged the jury that

> the law of Georgia provides that a person commits criminal solicitation when, with intent that another person engage in conduct constituting a felony, that person solicits, requests, commands, urges, or otherwise attempts to cause the other person to engage in conduct and does create a clear and present danger — danger that the other person will engage in such conduct constituting a felony.

Neither defense counsel nor the prosecutor raised any specific objections to the jury charge, although defense counsel reserved his objections. After the jury found Essuon guilty on both counts, the court imposed two consecutive sentences of five years' imprisonment. Essuon moved for new trial based on the claims of error he now raises. Following the court's denial of his motion, Essuon filed this appeal.

1. The audio recordings presented to the jury, in conjunction with Oglesby's testimony, were sufficient to authorize any rational trier of fact to find Essuon guilty beyond a reasonable doubt of the two counts of criminal solicitation to commit murder.

> On appeal from a criminal conviction, we view the evidence in the light most favorable to the verdict, and [Essuon] no longer enjoys the presumption of innocence. We neither weigh the evidence nor assess the credibility of witnesses, but merely ascertain that the evidence is sufficient to prove each element of the crime beyond a reasonable doubt. Moreover, conflicts in the testimony of the witnesses are a matter

of credibility for the jury to resolve. As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld.[1]

2. A reversal of Essuon's convictions is required, however, due to the trial court's error in failing to instruct the jury on the legal definitions of "felony" and "murder," as these were essential elements of the crime charged.

"It is the duty of the judge, with or without request, to give the jury an appropriate instruction as to the law on each substantive point of issue involved in a case so as to enable the jury to judiciously decide the guilt or innocence of a defendant."[2] "The trial judge must charge the jury on each crime specified in the indictment or accusation, unless the evidence does not warrant a conviction of such crime, or unless the state has affirmatively withdrawn a crime or stricken it from the indictment or accusation."[3] Where, as here, certain legal offenses (i.e., felony, murder) constitute elements of the crime charged (i.e., criminal solicitation), we have held that, even in the absence of a request to so charge, the trial court errs in failing to provide the jury with the legal definitions of the elemental crimes.[4] In *Phelps v. State*,[5] we concluded that without such a proper instruction, "the charge was substantially in error, was harmful as a matter of law, and that [defendant] was deprived of his right to a fair trial."[6] As stated in *Phelps*, "[w]e will not presume, in the absence of a proper instruction from the court, that a jury is cognizant of the legal definition of [an underlying offense] and will apply the appropriate legal standard in [deciding the case]."[7]

There is no merit in the state's argument that the charge as a whole was sufficient to convey the intended meaning to the jury, because nowhere in the remainder of the charge did the trial court define the elements of the underlying offenses for the jury. Nor is

---

[1] *Thomas v. State*, 273 Ga. App. 357, 358 (1) (615 SE2d 196) (2005) (punctuation and footnotes omitted).

[2] *Powers v. State*, 150 Ga. App. 25, 26 (3) (A) (256 SE2d 637) (1979) (citations and punctuation omitted).

[3] *Gardner v. State*, 185 Ga. App. 184 (363 SE2d 843) (1987) (citation, punctuation and emphasis omitted).

[4] See *Moore v. State*, 235 Ga. App. 175 (509 SE2d 108) (1998) (defendant's convictions of burglary with intent to commit rape reversed where trial court failed to legally define rape for jury); *Phelps v. State*, 192 Ga. App. 193, 195 (1) (384 SE2d 260) (1989) (same as *Moore*); *Gardner v. State*, supra (defendant's criminal trespass conviction reversed where trial court did not charge jury on elements of that crime); *Powers v. State*, supra (same as *Moore* and *Phelps*).

[5] Supra.

[6] 192 Ga. App. at 196 (1) (citing OCGA § 5-5-24 (c) and cases).

[7] Id. (citation and punctuation omitted).

there any merit in the state's suggestion that any error in the charge was harmless. It would appear that where, as here, facts have been shown giving rise to an error that is "harmful as a matter of law," no additional facts could render the error harmless. And although we have entertained a claim that a failure to instruct the jury on the elements of an underlying offense was harmless error because the evidence was overwhelming,[8] we have not been cited to any case, nor have we found any, in which an error harmful as a matter of law has not resulted in a reversal.

For these reasons, Essuon's convictions must be reversed.

*Judgment reversed. Johnson, P. J., and Mikell, J., concur.*

DECIDED JULY 30, 2007.

*Robert L. Persse,* for appellant.

*Richard A. Mallard, District Attorney, W. Scott Brannen, Assistant District Attorney,* for appellee.

---

[8] See *Moore v. State,* supra.