NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: August 21, 2023

S23A0647. DEMURO v. THE STATE.

ELLINGTON, Justice.

A Chatham County jury found Joshua DeMuro guilty of murder in the shooting death of Kevin Gilman.[1] DeMuro challenges the sufficiency of the evidence and contends that the State failed to prove beyond a reasonable doubt that the fatal shooting was not justified. DeMuro also contends that the trial court gave incomplete jury instructions on witness credibility, impeachment, and

---

[1] The shooting occurred on March 19, 2018. On April 18, 2018, a Chatham County grand jury returned an indictment charging DeMuro with malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), and aggravated assault (Count 3). Following a December 2021 trial, a jury found DeMuro guilty on all three counts. On December 20, 2021, the trial court sentenced DeMuro to serve life in prison on Count 1. Count 2 was vacated by operation of law, and Count 3 merged with Count 1 for sentencing. DeMuro filed a timely motion for a new trial, which, through new counsel, he amended on October 21, 2022. The trial court denied DeMuro's motion for a new trial on February 1, 2023. DeMuro filed a timely notice of appeal, and the case was docketed in this Court to the April 2023 term and submitted for a decision on the briefs.

justification and that the trial court erred in refusing to send written jury instructions out with the jury. For the reasons explained below, we affirm.

1. DeMuro contends that the State failed to prove beyond a reasonable doubt that the fatal shooting was not justified, and he argues that no evidence supported an inference of either malice or implied malice. When evaluating the sufficiency of evidence as a matter of constitutional due process, the proper standard of review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). "This Court will uphold the jury's verdict as long as there is some competent evidence, even if contradicted, to support each fact necessary to make out the State's case." *Williams v. State*, 316 Ga. 147, 150 (1) (886 SE2d 818) (2023) (citation and punctuation omitted). "When a defendant presents evidence that he was justified in using deadly force, the State bears the burden of disproving the defense beyond a reasonable doubt." Id. (citation and punctuation omitted). "It is the

2

role of the jury to evaluate the evidence and, when doing so, the jury is free to reject any evidence in support of a justification defense and to accept the evidence that the shooting was not done in self-defense." Id. (citation and punctuation omitted).

(a) Viewed according to this standard, the evidence presented at trial showed the following. Dylan Cribbs ("Dylan") and Philipo Mihailidis each testified about an encounter between the two of them on March 19, 2018, in downtown Savannah that led to a fist fight on Hurst Avenue. Dylan and Mihailidis had been acquainted for years, beginning when Mihailidis lived near the Cribbses' home on Hurst Avenue. Dylan testified that, at the time of the encounter, they were not on friendly terms. That night, Dylan drove downtown to pick up his girlfriend, Brianna Bedgood, from work, and was headed home when they encountered Mihailidis, who was driving in that area with his girlfriend, Madison Brundage. Dylan testified that Mihailidis began driving aggressively, trying to run him off the road. Mihailidis testified that it was Dylan who tried to run his vehicle off the road. Mihailidis testified that he followed Dylan's

3

vehicle to Hurst Avenue, "to find out why [Dylan] had a problem with [him]." Along the way, Mihailidis called Gilman, his best friend, who was like a brother and mentor to him, and explained that he was having an issue with Dylan and was headed to Hurst Avenue. Gilman agreed to meet him there. Meanwhile Dylan called his brother, Cody Cribbs ("Cody"), as he drove "[j]ust to be there, just in case [Mihailidis] tried to come attack [him] or anything like that." Dylan testified that he reached his house, and then Cody and his friend, DeMuro, pulled up in DeMuro's truck. Dylan testified that he and Cody confronted Mihailidis, where he was parked down the street, while DeMuro stayed back at the house. A fight ensued. Dylan and Mihailidis both testified that Gilman arrived in his car and joined the fight. Dylan testified that Gilman knocked him unconscious. When he came to, Cody and Mihailidis were still fighting, and DeMuro was struggling with Gilman. Dylan testified that he ran home and did not see the shooting. Mihailidis testified that Gilman got DeMuro and Dylan "in a headlock" and took them to the ground. Mihailidis testified that, as they fell, he saw a

4

handgun in DeMuro's back pocket. While DeMuro was on the ground, "the first shot went off." Mihailidis testified that, after that shot, Gilman got up, said to DeMuro, "Whoa, whoa . . . stop," ran back to his car, and turned to open the door. Mihailidis testified that DeMuro then "unloaded," shooting repeatedly in Gilman's direction. Mihailidis fled in his truck, with Brundage. Mihailidis testified that, throughout the incident, he never saw Gilman holding a gun.

Brundage also testified about the "road rage kind of thing" between Mihailidis and Dylan that preceded the fight on Hurst Avenue. She testified about the first part of the fight, involving the Cribbs brothers and Mihailidis, and testified that DeMuro "jumped in" after the fight was in progress. Brundage testified that Gilman arrived and put DeMuro and Dylan in a "headlock." Brundage testified that she heard Mihailidis yell, "There's a gun." She heard a single gunshot and then more shots as Mihailidis drove them away, but she did not see who was shooting or being shot.

Several neighbors called 911 to report hearing shots fired. DeMuro immediately surrendered to the first responding officer and

said, "I shot him[.]" The officer asked, "[W]here is the gun?" DeMuro answered, "I put them in the truck." The forensics team located two guns on the front seat of DeMuro's truck, a Glock 30-S, which was unloaded, and a Glock 20, which contained a fully loaded magazine. On the night of the shooting, an investigator contacted a neighbor, who lived a few houses down and had two security cameras mounted on the front of his house. That neighbor's security system recorded the shooting and events surrounding it, and the security footage was played for the jury. Because of the limited illumination, the video did not show small objects, such as any weapon, and does not show details such as facial features. The video showed a few people fighting and then a flash. After the flash, the people began to walk or run away from each other; there was another flash in proximity to one person; and another person fell to the ground. The first person approached the second person, who was still on the ground, and stopped near him. Then there were several flashes between the first person and the second person.

A forensic pathologist testified that he performed an autopsy on Gilman's body and found five penetrating gunshot wounds, plus one graze wound, to Gilman's face and torso. All of the wounds were deemed wounds of indeterminate range, meaning the weapon was fired from at least 18 inches away. There were no exit wounds; five bullets were recovered from Gilman's body. All of the penetrating wounds traveled in an upward direction. One entrance wound was on Gilman's left upper back; the bullet traveled upward and across the midline toward the right. That bullet did not strike any organs, vertebrae, or other bones, and lodged in muscle tissue at the back of Gilman's neck, at the level of the seventh cervical vertebra, on the right. Although the entrance wound was on Gilman's back, the path of travel of that bullet indicated that Gilman was shot from the side. One wound to Gilman's face caused serious injuries to his brain. There were also two entrance wounds on Gilman's chest, one on the right and one on the left; a graze wound on his left chest; and an entrance wound on his right upper abdomen. In response to a hypothetical question, the pathologist testified that the injuries

were consistent with the wound to Gilman's back being the first inflicted. In addition, the pathologist testified that a person who received such a wound by itself and who received prompt medical attention most likely would have recovered.

A firearms examiner testified that three of the bullets removed from Gilman's body had been fired by the .45-caliber Glock 30-S that had been seized from DeMuro's truck; two of the bullets were too damaged for comparison. The firearms examiner testified that ten .45-caliber cartridge casings that had been collected at the location of the shooting were fired by that same weapon.

An audio-video recording of DeMuro's custodial statement on the night of the shooting was played for the jury. In that statement, DeMuro said that Gilman slammed him into Mihailidis's truck, knocking off his glasses. DeMuro stated that he is "about legally blind without [his] glasses." DeMuro said Gilman "bear-hugged" him and took him to the ground and was choking him to the point that DeMuro was "probably going to pass out," so he drew his .45-caliber Glock 30-S from his holster and fired a round in the air when the

8

gun was very close to his and Gilman's heads. DeMuro thought, "I just disorient[ed] him. I can go," and he got up and walked a few feet away. At that point, he "had this whitewashed feeling come over" him, and he wondered where his second gun, the 10mm Glock 20, was. DeMuro stated, "I turn around. My gun was in [Gilman's] hand . . . and I just unloaded every round I had in that magazine." Before DeMuro fired at Gilman, Gilman was "just standing there," looking "disorient[ed]," with the Glock 20 "still pointed at the ground," but DeMuro felt he needed to shoot Gilman because Gilman had come and "just started assaulting people" and was now holding a loaded weapon. DeMuro had heard "before from other people around town that Kevin Gilman was kind of mental, kind of always liked fighting." DeMuro stated, "I tried everything in my power to try to avoid a deadly situation like this." When DeMuro fired the first shot at Gilman, Gilman "was broadside" to DeMuro, not facing him. After emptying his Glock 30-S in Gilman's direction, DeMuro picked up the Glock 20, which was still fully loaded, from the ground where it had "dropped right next to" Gilman and put it and the now-empty

9

Glock 30-S he used to shoot Gilman in his truck. DeMuro stated, "I hated to do it, but, honestly, I feared for my own life. I was already assaulted pretty bad and I just thought, 'There's fifteen rounds in that gun. He could kill everybody here.'" DeMuro did not know how many shots he fired but stated, "[A]s I saw the gun in his hand[,] . . . it was just instinct[,] and I said, 'Just shoot and kill until he's dead,'" and, "I just shot him until I just knew he was dead because . . . he had one good firearm and there were other people and the only thing I could think of, like, 'I'm not letting my . . . friends die because somebody wanted to follow my friends from downtown.'"

At trial, DeMuro testified in support of his sole defense that the shooting was justified in defense of himself and others and largely reiterated his custodial statement. DeMuro testified that, on the night he shot and killed Gilman, he and his friend, Cody, were relaxing at DeMuro's house on Hurst Avenue, several doors down from the Cribbses' home, watching a movie, when Cody received a phone call, "and he seemed quite frantic" and "distraught." Cody said it was something with his little brother, and said, "We've got to

go." Cody grabbed DeMuro's keys and ran out the door. DeMuro, who had a concealed-carry permit and described himself as being "passionate" about guns, was already carrying his .45-caliber Glock 30-S, loaded with 10 rounds of ammunition, inside his waistband in a "belly holster." Before following Cody out the door, DeMuro picked up his 10mm Glock 20, loaded with 15 rounds, and stuck it in his back pocket.

DeMuro testified that Cody drove DeMuro's truck and stopped beside Mihailidis's truck in the middle of Hurst Avenue, and Cody and Mihailidis exchanged "heated words" through their windows. Cody then parked at the Cribbses' house. Dylan was already at their house. The two brothers ran down the street to where Mihailidis was still parked a few houses down. DeMuro testified that he initially hung back at the Cribbses' house, and he told Bedgood and her brother, Tim Treadwell, who were standing outside the house, to call the police. DeMuro testified that he saw that Cody and Dylan were fighting Mihailidis. Bedgood and Treadwell urged DeMuro to "go down there," and he responded that he could not do that. But then,

DeMuro testified, he saw that "somebody was on the ground probably getting hurt and so [he] wanted to go and try and stop it." He again told Bedgood and Treadwell to call the police and then "proceeded to walk back down the street." DeMuro verbally tried to break up the fight but did not get physically involved in the scuffle at first. Then Gilman arrived in his car; DeMuro testified that he was familiar with Gilman only by reputation around the neighborhood, which was "[t]hat he had a very violent attitude." DeMuro testified that Gilman ran up to Dylan, and knocked him out with a punch to the face. From "several feet away," DeMuro "asked [Gilman] to stop. [Gilman] look[ed] at [DeMuro] and [said], 'You want some, too?'" DeMuro said, "no," and backed away with his hands raised. DeMuro testified that Gilman ran at him, slammed him twice into the side of Mihailidis's truck, causing DeMuro's glasses to fly off into the back of the truck, and then threw DeMuro to the ground.

DeMuro testified that Gilman began choking him and he began to lose consciousness. Fearing for his life, DeMuro "had to figure out

a way to get [Gilman] to stop choking [him]." DeMuro drew his Glock 30-S out of his belly holster and "made the decision at that point not to shoot anybody but to simply fire a warning shot in the only safe direction that [he] thought was possible at that time, which was straight [up] in the air." After that shot, Gilman let go of DeMuro and said, "Whoa." DeMuro testified that he remained on the ground, "trying to regain [his] faculties, [his] breathing and [his] vision. And after a few seconds [he] began to stand and at that point [he] realized that the weapon that was in [his] back pocket, the Glock 20, was no longer there." DeMuro testified that he observed that Gilman was "broadside" of him, "facing the people behind and around [Mihailidis's] vehicle," with "a pistol in his hand." DeMuro testified that, Gilman "[i]nitially" had the gun "pointed at the ground," and he never pointed it at DeMuro.

DeMuro testified that he decided to shoot at Gilman, because he "had no indication that . . . [Gilman] was abandoning the fight and now he was armed." Gilman had driven up to the fight, knocked out Dylan, attacked DeMuro, slammed him into the vehicle two

13

times, knocking off his glasses, thrown him to the ground, placed him in a choke-hold until he nearly lost consciousness, and then obtained his second handgun, "and it was based on all of those things that [DeMuro] assumed that [Gilman] was going to use that firearm to continue the fight." DeMuro testified that, after he fired at Gilman "broadside," Gilman "hit the ground," but "appeared to be getting up," and DeMuro could clearly see that Gilman still had the weapon in his hand. DeMuro testified that, "[a]t that point [he] perceived [Gilman] to still be a threat, and[,] considering now that [Gilman] had been shot, [DeMuro] thought surely [Gilman] would shoot [him] or somebody else. . . . That is why [DeMuro] fired the additional rounds" while walking toward Gilman. DeMuro fired at Gilman until he "dispensed the whole magazine" and Gilman "was no longer a threat." DeMuro testified that, after shooting Gilman, he walked back to the Cribbses' house and called 911 on Bedgood's phone. He decided to pick up his Glock 20 handgun that was on the ground near Gilman "for safety reasons" because it was loaded. DeMuro put

the Glock 20 and the Glock 30-S he used to shoot Gilman in his truck and waited for the police to come.

(b) Under OCGA § 16-3-21 (a),

> a person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony.

Under OCGA § 16-3-21 (b) (1), "[a] person is not justified in using force . . . if he . . . [i]nitially provokes the use of force against himself with the intent to use such force as an excuse to inflict bodily harm upon the assailant[.]" And under OCGA § 16-3-21 (b) (3), a person is not justified in using force if he "[w]as the aggressor or was engaged in a combat by agreement unless he withdraws from the encounter and effectively communicates to such other person his intent to do so and the other, notwithstanding, continues or threatens to continue the use of unlawful force."

The only evidence that Gilman ever held a gun was DeMuro's custodial statement and trial testimony that – while being "about

15

legally blind" because his glasses were knocked off, trying to recover his breathing because Gilman had been choking him, and just after DeMuro fired a warning shot with his .45-caliber gun very close to his head – he saw Gilman holding his gun. But the jury was free to reject DeMuro's version of the facts in favor of witness testimony that Gilman was unarmed.

Furthermore, even DeMuro never claimed to see Gilman pointing the gun anywhere except the ground. DeMuro's statements and testimony showed that Gilman was turning away from him when he first fired in Gilman's direction. Mihailidis's testimony indicated that, between DeMuro's warning shot and the next shot, Gilman was running away from DeMuro, trying to get in his car. The jury could infer from the security video that the flashes were gunfire; that the first shot to strike a person caused that person to fall to the ground; and that multiple shots were fired at that person when he was on the ground. The evidence was sufficient for the jury to find that any belief on DeMuro's part that it was necessary to shoot Gilman was not a reasonable belief and therefore could not

16

serve as a basis for justification under OCGA § 16-3-21 (a). The evidence was also sufficient for the jury to find beyond a reasonable doubt that DeMuro provoked any threat of the use of deadly force as an excuse to shoot Gilman, or that he shot Gilman after Gilman was trying to withdraw from the conflict, either or which would preclude a justification defense pursuant to OCGA § 16-3-21 (b).[2]

Furthermore, pursuant to OCGA § 16-5-1, malice in the killing of another may either be express, a "deliberate intention unlawfully

---

[2] See *Williams*, 316 Ga. at 150-151 (1) (The evidence was sufficient to authorize the jury to reject the defendant's self-defense claim where the jury could have concluded from a video recording of the incident that the victim was walking to his girlfriend's truck to leave the apartment complex where a fight involving the defendant had taken place, when the defendant approached the victim from the side, fired his gun at the victim, and then walked away.); *Huff v. State*, 315 Ga. 558, 563 (1) (883 SE2d 773) (2023) (The jury was authorized to reject the defendant's self-defense claim where the jury could have concluded from a video recording of the shooting that the victim's conduct "did not give rise to a reasonable belief that [the victim] was threatening to physically harm [the defendant]."); *Jackson v. State*, 315 Ga. 543, 551 (1) (b) (883 SE2d 815) (2023) (The jury was authorized to reject the defendant's self-defense claim in part because the first victim was not within close range of the defendant and was walking away from the defendant's porch toward his car when the defendant shot him and the first victim's girlfriend was merely getting out of the car and walking to where the first victim lay, injured, and was not threatening the defendant in any way at the time he shot her.); *Gobert v. State*, 311 Ga. 305, 309 (1) (a) (857 SE2d 647) (2021) (The jury was authorized to reject the defendant's defense of self and defense of others theory where the defendant shot at the victims as they fled in a car and no one was "in any danger or in any imminent threat of harm at that point.").

17

to take the life of another human being which is manifested by external circumstances capable of proof[,]" or implied, "where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart." The malice necessary to establish malice murder "may be formed in an instant, as long as it is present at the time of the killing. It is for a jury to determine from all the facts and circumstances whether a killing is intentional and malicious." *Coates v. State*, 310 Ga. 94, 97-98 (849 SE2d 435) (2020) (citation and punctuation omitted). Evidence that DeMuro shot Gilman in the back as Gilman was walking or running away and then continued shooting Gilman as he lay motionless on the ground until, as DeMuro stated, he knew Gilman was dead was sufficient to support the jury's finding of malice.[3]

---

[3] See *Munn v. State*, 313 Ga. 716, 720-721 (1) (873 SE2d 166) (2022) (The evidence authorized the jury to find malice where the defendant argued with the victim, became angry, and shot the victim multiple times, despite the victim raising his hands and where the defendant admitted that the victim was "unarmed and unthreatening."); *Williams v. State*, 306 Ga. 674, 675 (1) (832 SE2d 843) (2019) (The evidence authorized the jury to find malice where the defendant "shot at an unarmed man who was driving away, following an argument," and the jury was entitled to reject the defendant's argument that he was overcome with emotion and fired at the victim as a result of a sudden,

18

For the foregoing reasons, this claim of error fails.

2. DeMuro contends that the trial court erred in instructing the jury. Specifically, he argues that the jury did not receive a complete set of instructions before retiring to deliberate, because the jury could not hear certain words and phrases in the court's recitation of the jury charge due to conditions in the courtroom. DeMuro points to multiple notations by the court reporter that words or phrases were "inaudible," including during portions of the jury instructions relating to witness credibility, impeachment, and justification.[4] DeMuro concedes that, because he did not object to the jury instructions as given, we review the alleged instructional error under the plain-error standard of review. See *Smith v. State*, 315 Ga. 357, 362 (3) (882 SE2d 289) (2022).

violent, and irresistible passion.); *Moran v. State*, 302 Ga. 162, 164 (1) (b) (805 SE2d 856) (2017) (The evidence authorized the jury to find malice where the defendant shot the victim in the back of the head at close range and where the defendant admitted that she shot at the victim as he tried to escape and was begging for his life.).

[4] The court reporter noted at the beginning of the transcript that "[n]otations of '(inaudible)' indicate individuals speaking over each other and/or background noise obscuring the spoken words and '(indiscernible)' indicates that an individual is either speaking too rapidly or too softly as to not be discernable.

Review for plain error means that we will reverse the trial court only if there was an instructional error that was not affirmatively waived, was obvious beyond reasonable dispute, likely affected the outcome of the proceedings, and seriously affected the fairness, integrity, or public reputation of judicial proceedings. [The appellant] has the burden of showing a clear or obvious error and further making an affirmative showing that the error probably did affect the outcome below.

Id. (citations and punctuation omitted). See also *Dolphy v. State*, 288 Ga. 705, 710 (3) (707 SE2d 56) (2011) (Where "there was no reversible error, . . . it follows that there could be no plain error either (since plain error does not exist in the absence of reversible error).").

The trial court's charge on witness credibility and impeachment was transcribed, in pertinent part, as follows:

[T]he jury must determine the credibility of the witnesses. In deciding this, you may consider all of the facts and circumstances of the case, including the witnesses' manner of testifying, the witnesses' means and opportunity of knowing the facts about which they testify, the nature of the facts about which they testify, the probability or improbability of their testimony, the witness[es]' interest or lack of interest in the outcome of the case, and the witness[es]' personal credibility insofar as may be shown in your presence and by the evidence, any evidence of bias towards a witness, any (inaudible) or

20

motive to testify as shown by the evidence, and that would provide your authorized decision of any pending prosecution or (inaudible due to construction noise).

Whether a witness has been impeached: The question of whether a witness has been impeached is whether you, the jury, believe the witness has been proven unworthy of belief. A witness may be impeached by disproving the facts to which the witness testified. Ladies and Gentlemen, in determining the credibility of witnesses and any testimony by them in court, the admission of facts or the (inaudible), you may consider more acceptable (inaudible) in terms of the credibility or the believability of any such witness. This may include, Ladies and Gentlemen, evidence that proves that the witness has been convicted of a felony offense. A felony offense is one punishable of one year or more in prison.

I further charge you, to determine the credibility of any witness, their credibility has been attacked, cast doubt upon or challenged as I've described above, any testimony (inaudible) court, you may consider where applicable evidence helping to support the credibility or believability of any such witness.

The charge on justification was transcribed, in pertinent part, as follows:

[T]he State has the burden of proving beyond a reasonable doubt Defendant's actions were not justified. If you decide Defendant's actions were justified or the State has failed to prove his actions were not justified beyond a reasonable doubt, then your duty is to find the Defendant not guilty.

I further charge you that Defendant is not justified in the felony use of force if he provokes a threat for use of

21

force against himself, intending to use that threat of force as an excuse to harm the other person. It's the initial presence unless he withdraws from the encounter and clearly communicates to the other person his intent to withdraw, and the other person continues or a threat is continued for use of unlawful force.[5]

Ladies and Gentlemen, for Defendant's threat for use of force to be justified: (1) Defendant must believe his felony use of force is necessary; (2) That belief must be reasonable, that is, a reasonable person would also believe that the threat of use of force be necessary; and (3) The Defendant's legal belief must be what prompted him (inaudible) of use of force.

I further charge you a person who is not the aggressor does not require (inaudible) before being justified in using force if he reasonably believes he (inaudible). Defendant's use of deadly force is justified even when there has not been any physical contact or injury. Defendant's action as alleged is sufficient beyond a reasonable doubt, Defendant's or other (inaudible) in imminent danger, Defendant on the -- is the Defendant in imminent danger of serious bodily injury or in a forcible felony (inaudible), then Defendant's use of deadly force may be justified. Worry is alone never justified in the use of deadly force no matter how (inaudible). Even though

---

[5] This appears to be a transcription error. Based on the court's statement at the jury charge conference about the instructions the court intended to give, it appears that the court's instruction here was modeled on the pattern instruction regarding circumstances in which a defendant is not justified in the use of force, including when he is the initial aggressor, unless he withdraws from the encounter and clearly communicates to the other person his intent to withdraw and the other person continues or threatens to continue the use of unlawful force. See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 3.10.10 (4th ed., 2022).

(inaudible) accompanied by some menacing action, may justify the use of deadly force.

A forcible felony is a felony involved in the use of force or (inaudible) against another.

Again, aggravated assault as used in this situation, is a forcible felony and (inaudible) as defined here.

As noted above, DeMuro did not object to the jury charge as given, on the basis that any part of the court's verbal instructions were hard to hear or on any other basis. Neither did the prosecutor raise any issue about the audibility of the instructions. Likewise, no juror voiced any concern about having difficulty hearing during the charge. During jury deliberations, the jury sent a single note to the court, which was a request to review specific trial exhibits. The jury did not request written instructions or repetition of any particular instructions.

DeMuro argues that it is error to give the jury an incomplete charge and that the defect in the charge is not subject to dispute because the transcript shows that the instructions were incomplete. He argues that it is speculative to assume that the jury heard words that the court reporter did not hear and record in the transcript.

23

DeMuro contends that this error affected his substantial right to a fair trial because the subjects on which the jury was inadequately charged (justification, witness credibility, and impeachment) impacted how the jury considered his sole defense of justification and the testimony from witnesses who were impeached. DeMuro argues that this Court should exercise its discretion and reverse his convictions because allowing them to stand seriously affects the fairness, integrity, and public reputation of judicial proceedings.

We conclude, however, that DeMuro fails to meet the plain-error standard. He has not shown, and we cannot assume, that the jurors could not hear the words or phrases that the court reporter was unable to transcribe, especially since the jury did not ask for repetition or clarification of any instruction, and there is no indication in the record that counsel for the State or for DeMuro were unable to hear the instructions. Under the circumstances, it is not "obvious beyond reasonable dispute" that the verbal instructions delivered by the trial court were actually incomplete in the respect indicated by the court reporter's inability to transcribe certain words

and phrases. See *Smith*, 315 Ga. at 362 (3). DeMuro has not met his burden of establishing that the designated portions of the jury charge constitute plain error, and this claim of error fails. See *Sapp v. State*, 290 Ga. 247, 250 (2) (719 SE2d 434) (2011) (In the case of allegedly incomplete jury instructions, the appellant's burden under the plain-error test includes showing that the designated omission constituted an error that was clear or obvious, rather than one subject to reasonable dispute.).[6]

3. DeMuro contends that the trial court erred by not sending written jury instructions back with the jury. He argues that the transcript shows that acoustics were poor during the trial, partly because of Plexiglas barriers in place and people sitting further apart than usual as part of precautions taken due to the COVID-19

---

[6] The case DeMuro cites, *Essuon v. State*, 286 Ga. App. 869 (650 SE2d 409) (2007), even if it were binding on this Court, is distinguishable, in that the appellant in that case showed that the jury charge at issue entirely omitted two essential elements of the crimes charged. See id. at 872 (2) (Reversal of convictions of criminal solicitation to commit a felony, the underlying felony being murder, was required because the trial court failed to instruct the jury on the legal definitions of "felony" and "murder," which were essential elements of the crime charged.).

25

pandemic.[7] In addition to the court reporter's inability to completely transcribe the jury instructions, as discussed in connection with the previous claim of error, DeMuro points to multiple times that the judge expressed difficulty hearing what was said by counsel or witnesses and multiple times others expressed difficulty hearing the judge. DeMuro argues, based on multiple instances where someone expressed difficulty hearing another person speaking, "it was, or should have been, apparent to the trial court that everyone in the courtroom was having a hard time hearing what was being said throughout the trial" and that the jury would need written instructions during deliberations.

The transcript shows that, during the jury charge conference, the judge expressed an inclination not to send a copy of the written charge out with the jury. The prosecutor agreed. DeMuro's counsel stated, "I come from a different school of thought on that, Judge. I don't see any reason why they can't have the law. It probably saves

---

[7] We note that, in addition to references to Plexiglas barriers, the court and counsel also referred to problems with hearing jurors during voir dire due to the wearing of masks.

us some time in briefing meetings." DeMuro's counsel did not comment on any acoustical issues that may have interfered with the jury's ability to hear the court's charge. The trial court then announced, "Initially I'm not going to give a copy of the charge to the jury, but if they come back and request to have them recharged, I'll give it at that point." DeMuro's counsel did not object to that plan, object at the end of the charge to any of the instructions, or subsequently request that written instructions be sent out with the jury. We assume without deciding that, despite DeMuro's failure to object, plain-error review is authorized on the basis that the failure to provide the jury with written instructions constituted in this case "a failure to charge the jury[.]" See OCGA § 17-8-58 (a), (b).[8]

---

[8] OCGA § 17-8-58 provides:

(a) Any party who objects to any portion of the charge to the jury or the failure to charge the jury shall inform the court of the specific objection and the grounds for such objection before the jury retires to deliberate. Such objections shall be done outside of the jury's hearing and presence.

(b) Failure to object in accordance with subsection (a) of this Code section shall preclude appellate review of such portion of the jury charge, unless such portion of the jury charge constitutes plain error which affects substantial rights of the parties. Such plain error may be considered on appeal even if it was not brought

We have held that "there is no requirement under Georgia law, either statutory or otherwise, that the jury be given a written copy of the court's instructions for use in deliberations. Though trial courts clearly have the authority to do so, they are not required to do so." *Franklin v. State*, 298 Ga. 636, 642 (4) (784 SE2d 359) (2016) (citation omitted). DeMuro has not identified any precedent holding that a trial court's decision not to send written jury instructions out with the jury is reversible error, even if the transcript ultimately shows that courtroom acoustics were not ideal or that the court reporter was unable to transcribe every word of particular instructions. See *Stewart v. State*, 311 Ga. 471, 476 (1) (b) (858 SE2d 456) (2021) (Although the jury instructions at issue, in particular the verdict form, deviated from the pattern instructions, the instructions were not erroneous in view of the unequivocally clear words of a statute or court rule or in view of controlling precedent. In the absence of controlling authority establishing that any error in

to the court's attention as provided in subsection (a) of this Code section.

28

the jury instructions at issue was obvious beyond reasonable dispute, the appellant could not meet the second prong of the plain-error test.). Therefore, DeMuro again has not met the plain-error standard, and this claim of error fails. See id.; see also *Walter v. State*, 304 Ga. 760, 767 (3) (b) (822 SE2d 266) (2018) ("An error is plain if it is clear or obvious under current law. An error cannot be plain where there is no controlling authority on point." (citation and punctuation omitted)).

*Judgment affirmed. All the Justices concur.*