**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: February 17, 2026

S25A1133. RIVERS v. THE STATE.

MCMILLIAN, Justice.

Karre Rivers appeals his convictions for malice murder and related crimes arising from the shooting death of Oshane Scott.[1] In his sole enumeration of error, Rivers asserts that the trial court erred in charging the jury on the use of excessive force in connection

---

[1] The crimes occurred on January 17, 2021. In August 2022, a Gwinnett County grand jury indicted Rivers for malice murder (Count 1), felony murder (Count 2), aggravated assault (Count 3), possession of a firearm during the commission of a felony (Count 4), and possession of a firearm by a convicted felon (Count 5). At a trial held from February 26 to March 1, 2024, the jury found Rivers guilty on Counts 1–4; Count 5 had been bifurcated prior to trial and was later nolle prossed. The trial court sentenced Rivers to serve life in prison without the possibility of parole for Count 1 and a consecutive five-year term in prison for Count 4; the remaining counts were either vacated by operation of law or merged for sentencing purposes. Rivers timely filed a motion for new trial, which was amended by new counsel in February 2025. Pursuant to agreement of the parties, the motion was decided on the briefs without a hearing, and on April 29, 2025, the trial court denied the motion, as amended. Rivers timely filed his notice of appeal, and his case was docketed to this Court's August 2025 term and submitted for a decision on the briefs.

with Rivers's justification defense. Because the trial court did not commit plain error in giving this charge, we affirm.

The evidence presented at trial showed that Scott lived with his girlfriend Jazmine Wright and their two children at an apartment complex in Lilburn. Scott used the apartment to grow and sell marijuana and other controlled substances. Scott owned one handgun, a Glock 9mm pistol that he was known to carry in a shoulder bag. Beginning shortly after midnight on January 17, 2021, Rivers's cell phone sent Scott's cell phone several text messages about purchasing "wax" and a "seventh" of an unknown substance. Rivers's cell phone texted Scott's cell phone at 1:51 p.m. that afternoon to let him know that he was on the way to Scott's apartment. When Rivers arrived, Scott and Wright were leaving their apartment, and Rivers walked up to their car. Scott was carrying his shoulder bag with the gun.

Wright had met Rivers, through Scott, on two prior occasions, but she did not know Rivers's name. Wright stayed in the car while the two men went upstairs to the apartment. Scott returned and

2

asked for the apartment keys, which Wright gave to him. Less than two minutes later, Wright heard several gunshots, followed by a pause and then two additional gunshots. She called 911, and as she ran toward her apartment, she passed Rivers running down the staircase with one hand in his pocket.

When Wright entered her apartment, she saw smoke and a bullet hole in the wall, along with Rivers's cell phone on the table. In the kitchen, she saw blood on the cabinets and Scott's feet sticking out of the laundry room. Scott was gasping for air and unable to speak. Wright pulled Scott into the kitchen and saw that one of his hands was still in his bag. She also saw pieces of Scott's gun in the laundry room. As soon as law enforcement officers arrived at the apartment complex, Wright picked up Rivers's cell phone and ran downstairs to give it to them, saying, "[T]his is the guy that shot him."

Wright told officers that she knew who shot Scott but that she only knew the shooter by his Instagram account "Lil Kae 2x" because he had repeatedly asked Scott to repost his rap songs on Instagram.

She also told officers that she was not aware of any problems between the two men and that she had not seen any aggression or animosity between them. Wright admitted to closing the door to the laundry room, where Scott grew the marijuana. She also admitted that there was between $15,000 and $20,000 in cash in the apartment that Scott had saved in part from selling illegal drugs. She denied altering or removing anything from the crime scene. A resident of the apartment complex told officers that she had heard multiple gunshots, a pause, and then several more gunshots.

Despite life-saving efforts, Scott died at the scene. Officers located $17,000 in cash and various controlled substances, including a "very small" marijuana grow supply, dried poppy flowers, a "hodgepodge" of what appeared to be homemade pills, and a small amount of THC wax.[2] The frame and magazine of Scott's firearm

---

[2] A narcotics investigator testified that live poppy flowers can be processed to produce opium, a derivative of other narcotics, but that he did not see any evidence that poppy flowers were being grown at Scott's apartment. The investigator also explained that THC wax is a type of concentrated THC stripped directly from a marijuana plant but that he did not see evidence that Scott was producing it in his apartment.

were located in Scott's shoulder bag, along with the spring, which was separated from the frame. The slide of the firearm was located in the laundry room and had sustained damage consistent with being shot while inside the bag. The firearm could not have been fired in that condition. Officers also located bloodied cash with a bullet hole through it in Scott's bag.

Five bullets and thirteen shell casings were found at the scene. Each of the casings were 9mm caliber of the same brand and had the same striker mark and breech face characteristics; a firearms examiner testified that this indicated they had all been fired from the same firearm. There were six rounds in Scott's pistol, which was the full capacity for that firearm, and none of those rounds were the same brand as the casings located at the scene. Scott's pistol was later reassembled, and officers performed test fires of the weapon. The markings from the test fired rounds showed that Scott's pistol could not have generated any of the casings located at the scene.

Officers were able to determine that the phone left behind in Scott's apartment was associated with Rivers and that Rivers's

driver's license photo was consistent with the photos from the Instagram account that Wright had provided. Rivers was arrested approximately one month later after attempting to flee from a traffic stop. After being informed of his rights under *Miranda*,[3] Rivers agreed to speak with investigators. Portions of that interview were played for the jury at trial.

Rivers initially told investigators that he went to Scott's apartment to buy marijuana and found Scott dead in the apartment. Later in the interview, Rivers said that he and Scott had lured a person named "Beano" to the apartment so that they could rob or kill Beano and that Beano shot Scott. Rivers then told investigators that he "had words" with Scott and punched Scott in the face. Rivers claimed that Scott pulled out a pistol, but he was able to take the pistol from Scott and shoot him with it. He then claimed that he put the pistol back in Scott's hand after shooting him but later said he threw the gun at Scott's body. Eventually, Rivers admitted to having a gun of his own and shooting Scott with that firearm, which he

---

[3] See *Miranda v. Arizona*, 384 US 436 (1966).

disposed of after fleeing to St. Louis for several weeks. Each time law enforcement presented Rivers with new evidence from the crime scene, Rivers would pause and then change his story.

The medical examiner who performed Scott's autopsy determined that the cause of death was multiple gunshot wounds to the torso, bilateral upper extremities, and left thigh. Two of the exit wounds were "shored," which indicated there was something solid behind Scott when the projectiles attempted to exit his body. The medical examiner opined that those gunshot wounds were inflicted when the linoleum kitchen floor was under Scott, that is, that Scott was already at least in a seated position when he sustained those two gunshots. The trajectory of several of the bullets also showed that they were fired at a downward angle, suggesting that Scott was on the ground when the shots were fired.

Rivers's theory at trial was that the shooting was justified as self-defense. Prior to trial, the State filed requests to charge, including the pattern jury instruction on excessive force. See 2 Ga. Jury Instructions – Criminal § 3.16.20 ("A defendant is not justified

7

in using excessive force while acting in (self-defense) (defense of others). If you decide that the Defendant used more force than was reasonably necessary to defend against the alleged victim's threats or use of force, then the Defendant's actions would not be justified."). During the charge conference, defense counsel objected to this instruction on the basis of relevance. The trial court ruled that the instruction was appropriate given the evidence and Rivers's justification defense.[4]

The trial court ultimately charged the jury:

A defendant is not justified in using excessive force while acting in self-defense. If you decide that the defendant used more force than was reasonably necessary to defend against the alleged victim's threat or use of force, then the defendant's actions would not be justified.

After giving the charge, the trial court asked whether counsel had any exceptions to the charge, and defense counsel responded in the negative.

Rivers argues that there was insufficient evidence to support

---

[4] The trial court also fully charged the jury on self-defense and that the State had the burden of proving beyond a reasonable doubt that Rivers's actions were not justified.

the charge on excessive force. "Because an objection voiced at the charge conference does not preserve objections to the charge as subsequently given, the failure to object to the charge as given precludes appellate review unless such portion of the jury charge constitutes plain error which affects substantial rights of the parties." *White v. State*, 291 Ga. 7, 8 (2012) (cleaned up). To establish plain error, Rivers must show that the alleged instructional error "was not affirmatively waived, was obvious beyond reasonable dispute, likely affected the outcome of the proceedings, and seriously affected the fairness, integrity, or public reputation of judicial proceedings." *DeMuro v. State*, 317 Ga. 155, 163 (2023) (citation omitted). If Rivers fails to satisfy one prong of this test, we need not address the other prongs. See *Baker v. State*, 319 Ga. 456, 462 (2024). "Satisfying this high standard is difficult, as it should be." Id. (citation and punctuation omitted).

Rivers has not shown error that is obvious beyond reasonable dispute. Rivers argues on appeal that the trial court erred in giving the excessive force instruction because the evidence was not

"conclusive as to who was doing the shooting and why." But even if the evidence were inconclusive in this respect, there was evidence that whoever fired the shots used excessive force and that Rivers was the person who fired the shots. All that is required for the giving of a jury instruction is slight evidence. See *Bowman v. State*, 317 Ga. 457, 463 (2023) ("Jury instructions must tell the jury the law of the case fully and fairly and are authorized if supported by slight evidence." (citations and punctuation omitted)). Contrary to Rivers's claims, all 13 shell casings located at the scene were the same brand and had the same striker mark and breech face characteristics, indicating they had all been fired by the same firearm. Also, eyewitness testimony placed Rivers in the apartment at the time that Scott was shot multiple times, and testimony from the medical examiner supported that Scott was shot twice after he was already on the ground.

Thus, there was at least slight evidence to support the giving of this charge, and the trial court did not err, much less commit plain error, in giving the excessive force pattern jury charge. See *Gold v.*

10

*State*, 319 Ga. 149, 151–52 (2024) (given evidence presented, trial court did not err in giving charge on excessive force as part of its broader instructions on self-defense); *Welbon v. State*, 278 Ga. 312, 312–13 (2004) (explaining the excessive force charge, which comes from the Suggested Pattern Jury Instructions, is a correct statement of law and was proper in light of the entire justification charge given where defendant claimed he shot the deceased four to six times in self-defense because the deceased was reaching for a gun).

*Judgment affirmed. All the Justices concur.*