**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: February 18, 2025

S25A0083. THE STATE v. GATES.

PETERSON, Presiding Justice.

The trial court granted immunity and dismissed charges for malice murder and some other crimes against Anthony Gates related to the shooting death of Ronald Hammock, and the State appeals. The State argues that the uncontradicted evidence, by way of a surveillance video, shows that Gates shot Hammock as Hammock was trying to flee and, therefore, Gates was not reasonably defending himself. After consideration of the full record on appeal, we cannot say that there is no evidence to support the trial court's conclusion that Gates reasonably believed that shooting Hammock was necessary to defend himself. Therefore, we affirm.

1. *The evidence presented at the immunity hearing.*

The evidence viewed in the light most favorable to the trial court's ruling[1] shows the following. On the day of the shooting, Gates went to a gas station to buy cigarettes and snacks. When Gates was at the cash register, Hammock walked behind Gates and stood by the front door, wearing a hat that said "No F**ks Given." When Gates pulled out money to pay for his items, Hammock came up to him and said, "Are you gonna come up off of that? Come off of that f**king — I got to have that." Gates looked around to see if Hammock was talking to him, and Hammock confirmed as much, telling Gates, "Yeah, I'm talking to you. Yeah, ni**a." Gates said he did not want any problems, but Hammock told him to "shut the f**k up" before "I knock you out."

Gates testified that he was scared and felt threatened by the victim, thinking he was going to be robbed or attacked. Gates hoped Hammock would leave him alone if he ignored him, so he turned his back to pay for his items. Hammock then struck Gates hard, and Gates responded by pulling out his gun.

---

[1] See *State v. Remy*, 308 Ga. 296, 298 (3) (840 SE2d 385) (2020).

Video surveillance from the store confirms that Hammock struck Gates in the head while Gates was turned away from Hammock. As Gates turned around, Hammock squared up to Gates, as if preparing to fight Gates. Gates pulled out his gun and began firing immediately. Upon seeing Gates pull out his gun, Hammock turned and headed toward the exit, but he fell near the front door after being shot. The investigating officer testified that, based on his review of the surveillance video and investigation in the case, Hammock was "shot in the back . . . as he was turning to run."

Gates returned to the register to gather his items before leaving the store. Gates testified that he did not want Hammock to die and that Hammock was responsive and breathing when he left. Gates stated repeatedly that he shot Hammock in self-defense, he was afraid for his life, and that his having been shot recently affected his decision to pull out his firearm. Gates denied shooting Hammock in retaliation for hitting him. Gates testified that he did not see Hammock with a gun, and there is no evidence that Hammock had one.

2. *Analysis of the State's argument.*

The State makes one argument on appeal — that Gates's use of force was not reasonably necessary and, therefore, he was not entitled to immunity. The State concedes that the victim was the initial aggressor but argues that the uncontroverted surveillance video shows that any danger of great bodily injury (or the need to prevent a forcible felony) had subsided at the time Gates pulled out his gun because the victim was running away. We disagree.

With some exceptions, a person who uses force in accordance with OCGA § 16-3-21 is immune from criminal prosecution. See OCGA § 16-3-24.2. Under OCGA § 16-3-21 (a), a person generally "is justified in using force which is intended or likely to cause death or great bodily harm . . . if he or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony." This standard contains both subjective and objective components. See *Allen v. State*, 317 Ga. 1, 5 (1) (890 SE2d 700) (2023). On the subjective prong, the defendant must show that he

4

actually believed that his use of force was necessary. To meet the objective component, a defendant must show the "circumstances were such as to excite the fears of a reasonable person that he or a third person faced death or great bodily injury[.]" Id. (citation and punctuation omitted). Generally, a claim of self-defense or justification is raised as an affirmative defense at trial, so it is usually a question for the jury, as the fact-finder, to determine whether or not the evidence shows that the defendant believed it was necessary to use deadly force to prevent death or great bodily injury to himself and to determine whether that belief was reasonable. See, e.g., *Young v. State*, 272 Ga. 17, 18 (524 SE2d 233) (1999); *Anderson v. State*, 245 Ga. 619, 623 (1) (266 SE2d 221) (1980). At a jury trial, when the defendant presents evidence of self-defense, the State bears the burden of disproving that defense beyond a reasonable doubt. See *Russell v. State*, 318 Ga. 556, 559 (2) (905 SE2d 578) (2024).

The process is slightly different when a claim of self-defense is raised in a pre-trial motion for immunity under OCGA § 16-3-24.2.

5

In such cases, the trial court sits as the finder of fact, and a defendant has the burden of proving self-defense by a preponderance of the evidence. *Ellison v. State*, 313 Ga. 107, 110 (868 SE2d 189) (2022). Just as we accept a jury's conclusion with respect to a defendant's self-defense claim at trial if there is competent evidence supporting that determination,[2] in reviewing the grant of immunity, we review the evidence in the light most favorable to the trial court's ruling and accept the trial court's factual findings and credibility determinations "if there is *any* evidence to support them." *State v. Remy*, 308 Ga. 296, 298 (3) (840 SE2d 385) (2020) (citation and punctuation omitted; emphasis added).

> In doing so, . . . we may consider facts that definitively can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility, such as facts indisputably discernible from a videotape. On the other hand, to the extent that legally significant facts were proved by evidence other than the video

---

[2] In reviewing a claim that the jury was wrong to reject a self-defense claim and find the defendant guilty, "[t]his Court will uphold the jury's verdict as long as there is some competent evidence, even if contradicted, to support each fact necessary to make out the State's case." *DeMuro v. State*, 317 Ga. 155, 155-156 (1) (892 SE2d 31) (2023) (citation omitted).

recording, the trial court as factfinder was entitled to determine the credibility and weight of that other evidence.

*Allen*, 317 Ga. at 5-6 (1) (citations and punctuation omitted).

Although some of us may have ruled differently than the trial court did here, we are not the fact-finder in this case, and the record permitted the trial court to conclude that Gates met his burden of establishing immunity from prosecution. The undisputed evidence shows that Hammock struck Gates when Gates had his back turned toward him, and that Gates turned around, pulled out his weapon, and immediately fired in response. Gates testified that he believed shooting his gun was necessary to defend himself because Hammock had threatened to rob Gates and Hammock said he would "knock out" Gates. The trial court implicitly credited Gates's testimony when it ruled in his favor, and the State does not dispute that Gates actually thought the shooting was necessary to defend himself.

Instead, the State argues that the shooting was not objectively reasonable because Gates was no longer in danger once he pulled out his gun. But the State ignores how quickly the events transpired,

7

as Gates began firing as soon as he turned around. The State also points to the fact that Hammock was unarmed and was shot in the back to show that Gates's use of force was unreasonable. But the State points to no evidence showing that Gates knew before he shot Hammock that he was unarmed. All Gates knew at the time he fired his gun was that Hammock had threatened to knock him out and had struck him in the head. And although the fatal bullet struck Hammock in the back, Gates began to fire immediately, and the investigating officer testified that Hammock was shot while "turning." The State focuses on frame-by-frame review of the video to argue that the threat had ended a split-second before Gates shot. But when a judge considers whether a decision to defend oneself immediately after being assaulted[3] was objectively reasonable, it is critical to consider the circumstances at the time of the shooting and not be guided by a post-hoc, time-manipulated, frame-by-frame review of a recording that does not mirror the realities of the

---

[3] Our caselaw plainly establishes that hands can be deadly weapons. See *Dasher v. State*, 285 Ga. 308, 311 (3) (676 SE2d 181) (2009).

8

shooting when it happened. See *Willerson v. State*, 312 Ga. 369, 373 (1) (863 SE2d 50) (2021) ("[T]he critical factor in a justification defense is whether a defendant acted with the fear of a reasonable person under the circumstances." (citation omitted)). And a reviewing judge must remember that the defendant does not have the burden on an immunity motion to show without a doubt that he acted in self-defense; instead, he must merely show by a preponderance of the evidence that he did so. See *State v. Bunn*, 288 Ga. 20, 22 (701 SE2d 138) (2010) ("Preponderance of the evidence means that [the] superior weight of evidence upon issues involved . . . is [ ] sufficient to incline a reasonable and impartial mind to one side of the issue rather than the other. [But n]othing in this standard requires the elimination of all fact disputes as a matter of law." (punctuation and citations omitted)). Moreover, contrary to any argument by the State, the fact that Hammock was shot in the back is not dispositive as to whether Gates was justified in using force. Cf. *Terry v. State*, 243 Ga. 11, 13 (252 SE2d 429) (1979) (citing case in which self-defense "could be rejected" where the victim was

shot in the back).

The State also argues that we owe no deference to the trial court's implicit factual and credibility findings because this Court can also review the surveillance video. The State notes two parts of Gates's testimony that it says are contradicted by the surveillance footage: (1) Gates's testimony that Hammock never turned from him after he fired the first shot; and (2) his testimony that he did not know if Hammock had been shot because Hammock was still "up and coming." But there is no evidence that the trial court relied on this contradicted testimony in assessing whether Gates's use of force was objectively reasonable, and our review of the surveillance video shows no clear error in the trial court's conclusion on this issue. Given the victim's threats and unprovoked action in striking Gates from behind, it was objectively reasonable for Gates to believe that the victim would cause him great bodily injury (or death) if Gates did not defend himself. Therefore, the evidence was sufficient to support the trial court's determination that Gates met his burden of proving that he was entitled to immunity from prosecution.

*Judgment affirmed. All the Justices concur.*

LAGRUA, Justice, concurring specially.

I do not entirely agree with the majority's characterization of the facts surrounding the shooting in this case, and I also believe that, under the circumstances presented here, the trial court should have denied Gates's immunity motion and let the jury decide whether he was "justified in using force which [was] intended or likely to cause death or great bodily harm."  OCGA § 16-3-21 (a). Nevertheless, based on our current precedent, I am forced to concur specially in this case.

The evidence of record, including the surveillance videos from the convenience store, reflect that, on the night of this incident, Gates armed himself with a handgun before entering the convenience store—a handgun he was not legally permitted to have as a convicted felon.[4] While Gates was in the process of checking out

_____

[4] At the immunity hearing, Gates testified that he carried this handgun for "protection" because he had been shot two weeks prior at a nearby club, the Chit Chat, which made him fearful of being shot again. And I recognize that, while I have previously concurred questioning the intent of OCGA § 16-11-138, Gates was permitted to use a weapon *if* he was acting in his own defense.  See

12

and paying for his items, the victim and Gates exchanged words, and the victim approached Gates. When Gates briefly turned back towards the cashier, the victim struck Gates one time with an open-handed slap—a slap which resulted in no injury to Gates.[5] After the victim slapped Gates with an open hand, Gates—without stumbling or losing his footing—immediately pulled out his handgun. At that point, the victim turned away, and then—though Gates testified he reacted purely out of fear and in his own defense—Gates fired upon the victim twice—once in the victim's back as he was running away. After shooting the victim in the back, Gates stood next to the victim, holding his handgun and speaking words to the victim we do not

---

*Brundage v. State*, ___ Ga. ___, ___ (___ SE2d ___) (Case No. S24A1369, decided January 28, 2025) (LaGrua, J., concurring).

[5] This case is distinguishable from the one cited by the majority for the proposition that hands can be "dangerous weapons." OCGA § 16-5-21 (a) (2). See *Dasher v. State*, 285 Ga. 308, 310 (3) (676 SE2d 81 (2009) (observing that the appellants "repeatedly struck the victim about his face and head, causing him to lose consciousness and eventually die") (citing *Wright v. State*, 211 Ga. App. 474 (1) (440 SE2d 27) (1993) ("Hands and fists may be deadly weapons depending upon the circumstances, including the extent of the victim's injuries."); *Kirby v. State*, 145 Ga. App. 813 (4) (245 SE2d 43) (1978) ("Although fists and feet are not considered deadly weapons . . ., they may be found to be a deadly weapon by the jury depending on the manner and means of their use, the wounds inflicted, etc[.]")).

13

know and cannot hear, as no audio recording of the shooting exists, and no witnesses testified as to what was said. Gates then calmly retrieved the items he had purchased, stepped over the victim who was lying on the floor, exited the store, and drove away. Gates did not notify law enforcement of what occurred that night, and he was arrested for the incident three months later.

In the written statement Gates produced during his custodial interview, Gates said he acted out of fear that night, but he also admitted he was drunk when this incident occurred, which—in my view—should have helped inform the trial court's determination of whether to grant immunity or leave the question for the jury to decide after hearing *all* the evidence in the case. Additionally, Gates told law enforcement officers during his interview—and repeated in his written statement—that he had been at the Chit Chat club the night this incident occurred—the same club where he had been shot two weeks before—dispelling his argument that he used his weapon to defend himself that night because of the fear he still carried from the prior shooting.

Despite this disparaging evidence, there is also evidence that could support the conclusion that the victim intended to rob Gates that night, and thus, Gates was justified in using deadly force against him. See OCGA § 16-5-21 (a) (1) ("A person commits the offense of aggravated assault when he or she assaults: . . . [w]ith intent to . . . rob[.]"). See also OCGA § 16-3-21 (a) ("[A] person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is necessary . . . to prevent the commission of a forcible felony."). And, as noted by the majority, when a defendant claims that he or she was justified in using deadly force against a victim and seeks immunity from criminal prosecution under OCGA § 16-3-24.2, the trial court, as opposed to the jury, is the finder of fact. Additionally, "[t]o prevail on a motion for immunity under OCGA § 16-2-24.2," *Ellison*, 313 Ga. at 110, a defendant is only "required to show by a preponderance of the evidence that he acted in defense of himself or others." *Remy*, 308 Ga. at 298 (3). Whereas the State, when seeking to disprove a claim of self-defense, "bears the burden

of disproving the [justification] defense beyond a reasonable doubt." *Holloway v. State*, ___ Ga. ___, ___ (1) (___ SE2d ___) (Case No. S24A0892, decided on January 28, 2025) (citation omitted). See also *Mills v. State*, 320 Ga. 457, 461 (2) (910 SE2d 143) (2024) ("When a defendant presents evidence that he was justified in using deadly force, the State bears the burden of disproving the defense beyond a reasonable doubt.") (citation and punctuation omitted). While I recognize that this inconsistency in the evidentiary standards is what the law provides for, in cases where someone has been killed at the hands of another, the General Assembly could change the preponderance standard to a clear and convincing one. I also recognize that, when we review the granting of an immunity motion on appeal, we are bound "to accept the trial court's findings with regard to questions of fact and credibility if there is *any* evidence to support them." *Remy*, 308 Ga. at 298 (3) (citation omitted; emphasis added).

Given these standards, I must concur specially with affirming the trial court's ruling here—a ruling which is reflected in a one-

16

paragraph order containing no findings of fact or conclusions of law. But I must also emphasize that, given the evidence in this case and the trial court's own acknowledgement (on more than one occasion) that the question is "close, very close," the better ruling would have been to deny the immunity motion and leave the justification issue for the jury to decide, particularly on the limited record before the trial court.