**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**HODGES and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**May 27, 2025**

# In the Court of Appeals of Georgia

A25A0357. THE STATE v. BROOKS.

PIPKIN, Judge.

The trial court granted immunity and dismissed charges of aggravated assault and aggravated battery against Christopher Brooks for alleged crimes committed against Charles Hunter. The State appeals, arguing that, while Brooks had a right to defend himself against Hunter, Brooks responded with excessive force defeating his claim for immunity under OCGA § 16-3-24.2.[1] For the reasons that follow, we affirm.

---

[1] "A person who uses threats or force in accordance with Code Section 16-3-20, 16-3-21, 16-3-23, 16-3-23.1, 16-3-24, or 17-4-20 shall be immune from criminal prosecution therefor unless in the use of deadly force, such person utilizes a weapon the carrying or possession of which is unlawful by such person under Part 2 of Article 4 of Chapter 11 of this title."

When a defendant seeks immunity from prosecution based upon self-defense, "the defendant does not have the burden . . . to show without a doubt that he acted in self-defense; instead, he must merely show by a preponderance of the evidence that he did so." *State v. Gates*, ____ Ga. ____ (2) (912 SE2d 673, 677) (2025). "On appeal from an order on a motion under OCGA § 16-3-24.2, we review the evidence in the light most favorable to the trial court's ruling, and we generally accept the trial court's findings with regard to questions of fact and credibility if there is any evidence to support them." (Citation and punctuation omitted) *State v. Copeland*, 310 Ga. 345, 346 (1) (850 SE2d 736) (2020).

With this standard in mind, we turn to the evidence adduced at the relevant hearing; the trial court received testimony from, among others, Brooks and Hunter.[2] The testimony shows that, at all relevant times, Brooks and Hunter were neighbors in an apartment complex and, generally speaking, had a friendly relationship. Two weeks before the incident in question, though, Hunter tried to punch Brooks; Hunter later apologized, explaining that he "was off his medication." However, the parties

---

[2] The trial court also recieved testimony from a member of law enforcement; however, the officer did not witness the physical altercation.

had another violent encounter in the early morning hours of April 18, 2021, which gives rise to the instant matter.

According to Brooks, he exited his apartment to smoke a cigarette. Brooks testified that Hunter was already outside sitting in a chair and that he smelled of alcohol. Brooks explained that he greeted Hunter but that Hunter did not respond or look up to acknowledge his presence. Brooks tried greeting Hunter again, to which Hunter responded, "Well, why did you fuck my wife?" Brooks denied the accusation, but Hunter kept asking Brooks why he slept with his wife, becoming more agitated and "amped up." Brooks testified that, as he turned to head back into his apartment, Hunter punched him on the right side of his face, causing Brooks to fall over a metal folding chair and onto the ground. Brooks testified that Hunter was standing over him "right in my space." He testified that he "didn't know if [Hunter] was going to try to kick me" and explained that he was uncomfortable with Hunter standing over him. So, as he stood up, Brooks picked up the chair and "just swung it at [Hunter]" twice to stop him from standing over Brooks. Brooks missed Hunter the first time but hit him in the head the second time. Brooks then ran into his apartment and locked the door. Brooks testified that Hunter remained outside of his apartment for

3

approximately 10 minutes yelling things like "he was going to kill me, and he got something for me." Brooks testified that Hunter apologized to him the next day, saying "that he knew that he shouldn't have put his hands on me first."

On the other hand, Hunter testified that, on the night of the incident, his wife told him that Brooks had given her cocaine. Hunter testified that he said "I [can't] believe it," that he "got mad," and that he "stormed outside" to confront Brooks. Hunter testified that he approached Brooks and asked him "why did you give my wife some crack cocaine and alcohol," to which Brooks responded, "get the fuck out of my face." Hunter said he pushed Brooks first,[3] that the men got into "a little scuffle," and that when Brooks turned to face the door to his apartment, Hunter punched him, after which Brooks hit him with a chair. Hunter suffered an injury to his eye which required sutures.

After hearing all of the evidence, the trial court wrote a lengthy order granting Brooks' motion for immunity from prosecution. In this order, the trial court recounted the testimony of all of the witnesses from the hearing; the trial court found Brooks to be a credible witness and determined that the testimonies of Hunter and his

---

[3] Hunter's wife testified that Brooks, not Hunter, was the initial aggressor, contradicting the testimony of both Brooks and Hunter.

wife were "inconsistent, impeached, and at times nonsensical," noting that their "testimonies conflicted not only with [Brooks'] testimony, but also with each other." After making specific factual findings and credibility determinations, the trial court concluded that

> the circumstances of this case render Mr. Brooks's actions on April 18, 2021 to be consistent with those of a reasonable person under similar circumstances. Mr. Hunter was the primary aggressor, his course of actions was clear, and Mr. Brooks had mere seconds to process the events unfolding and respond accordingly. Mr. Brooks was not required to wait until Mr. Hunter voluntarily stepped down before defending himself against an on-going, escalating, violent physical attack.

The trial court found that Brooks had demonstrated by a preponderance of the evidence that he was immune from prosecution and granted the motion. The State now appeals.

> The controlling statute, OCGA § 16-3-21 (a), provides as follows:
>
> A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself or a third person against such other's imminent use of unlawful force; however, . . . a person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony.

Focusing on the second portion of OCGA § 16-3-21 (a), the State asserts that the trial court erred by granting Brooks immunity from prosecution because, the State argues, Brooks "was never under threat of force that was reasonably likely to result in death or great bodily injury." More specifically, the State contends that "[t]he trial court failed to recognize that [Brooks] did not establish [that] he had a reasonable belief that he had to use force to prevent death, great bodily injury, or to prevent the commission of a felony." We disagree. As recently explained by this Court, in considering a motion for immunity from prosecution,

> the trial court was required to consider whether [the alleged victim's] conduct constituted an imminent use of unlawful force and whether [the defendant's use of force] against [the alleged victim] was based on a reasonable belief that this force was necessary to defend himself . . . against [the alleged vicitm's] imminent use of unlawful force.

*State v. Larscheid*, 367 Ga. App. 660, 665-666 (888 SE2d 197) (2023) ("The immunity statute requires the trial court to consider the degree of force [the defendant] needed to defend against [the victim's] unlawful use of force."). If, however, a defendant's use of force "was intended or likely to cause death or great bodily harm," then a trial court must also consider whether the defendant's use of force "was based on his own reasonable belief that [the alleged victim] was threatening imminent use of unlawful

6

force intended or likely to cause death or great bodily injury" to the defendant or "whether the [alleged victim] was threatening a forcible felony." Id. (quoting *Copeland*, 310 Ga. at 356 (2) (c) (iv)).

Here, the trial court concluded that Brooks' actions were "consistent with those of a reasonable person under similar circumstances." Implicit in the trial court's ruling is that Brooks' use of force was neither intended or likely to cause death or great bodily harm, a ruling that the State fails to recognize, let alone challenge on appeal. And because the trial court determined that Brooks had not used lethal force, Brooks was not required to show that he reasonably believed that Hunter's use of force against him was intended or likely to cause death or great bodily injury. See *Larscheid*, 367 Ga. App. at 667; see also *Copeland*, 310 Ga. 356 (2) (c) (iv).

That said, even if we were to accept the State's position that Brooks' actions did amount to force that was intended or likely to cause death or great bodily harm, the trial court may still be affirmed. The evidence, as construed by the trial court, showed that Brooks used the chair against Hunter to prevent him from continuing to use his hands – or potentially his feet – to continue the assault. Georgia case law clearly states that hands and feet can be deadly weapons; consequently, Brooks'

actions could be understood to have been necessary to prevent the commission of a forcible felony, namely, aggravated assault. See, e.g., *Dasher v. State*, 285 Ga. 308, 311 (3) (676 SE2d 181) (2009) (recognizing that hands and feet "may be found to be a deadly weapon . . . depending on the manner and means of their use") (citation omitted).

To the extent the State challenges the trial court's determinations regarding Brooks' use of non-lethal force, we conclude that ruling is sound. "[W]hen a judge considers whether a decision to defend oneself immediately after being assaulted was objectively reasonable, it is critical to consider the circumstances at the time . . . ." *Gates*, ____ Ga. at ____ (2) (912 SE2d at 677). Here, the trial court found Brooks' testimony to be credible and specifically rejected the testimony of Hunter and his wife. And Brooks testified that, after Hunter punched him in the face, Hunter stood over him while he lay on the ground. Brooks further testified that he swung the chair toward Hunter for two reasons - to get him out of his personal space and because Brooks did not know whether Hunter would kick him while he laid on the ground. Finally, the evidence presented at the hearing established that Hunter was angry and "amped up" during the initial verbal altercation with Brooks; that Hunter was the

initial physical aggressor in the confrontation; and that, when Brooks turned around to leave, Hunter punched him in the face, the force of which was so hard that Brooks fell to the ground.[4] Based on the evidence and the trial court's credibility determinations, there is sufficient evidence to support the trial court's conclusions that Hunter was the initial aggressor and that Brooks used the chair to protect himself in a reasonable manner. See *Willerson v. State*, 312 Ga. 369, 373 (1) (863 SE2d 50) (2021) ("[T]he critical factor in a justification defense is whether a defendant acted with the fear of a reasonable person under the circumstances.") (citation and punctuation omitted). Accordingly, we affirm the judgment of the trial court.

*Judgment affirmed. McFadden, P. J., and Hodges, J., concur.*

---

[4] In support of its argument, the State heavily relies on the fact that Hunter had to have his eye removed; indeed this provided the basis for the State to charge Brooks with aggravated battery. However, as noted by the trial court, the undisputed evidence presented at the immunity hearing showed that, while Hunter received some stitches to his eye on April 18, his eye was not removed that day. Instead, six days later, Hunter returned to the hospital after he "fell on [his] face and ruptured [his] eye." Hunter testified that the doctors "couldn't save [the eye]" and had to remove it at that time.